

Office Of The Clerk
# Court of Appeal, Fourth Circuit
State of Louisiana

Justin I. Woods
Clerk of Court

JoAnn Veal
Chief Deputy Clerk of Court

400 Royal Street
Third Floor

Mailing Address:
410 Royal Street
New Orleans, Louisiana
70130-2199
(504) 412-6001
FAX (504) 412-6019

## NOTICE OF JUDGMENT AND
## CERTIFICATE OF MAILING

I CERTIFY THAT A COPY OF THE WRIT DISPOSITION IN THE BELOW-NUMBERED MATTER HAS BEEN MAILED ON OR DELIVERED THIS DAY 06/16/2017 TO THE TRIAL JUDGE, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

JIW/rmj
**JUSTIN I. WOODS**
**CLERK OF COURT**

## 2017-C-0289
## C/W: 2017-C-0291
## C/W: 2017-C-0292

Regina Carol Scotto Wedig
LAW OFFICES OF REGINA SCOTTO
WEDIG, LLC
308 South Bay Street
P. O. Box 185
Amite, LA 70422

John Henry Denenea, Jr.
SHEARMAN-DENENEA, L.L.C.
4240 Canal Street
First Floor
New Orleans, LA 70119

Natalie J. Taylor
BRADLEY MURCHISON KELLY & SHEA,
LLC
1100 Poydras Street
Energy Centre, Suite 2700
New Orleans, LA 70163-

L. David Adams
Dwight C. Paulsen, III
BRADLEY MURCHISON KELLY & SHEA
LLC
1100 Poydras Street
Suite 2700
New Orleans, LA 70163-

Ralph J. Aucoin
Richard A. Bordelon
DENECHAUD AND DENECHAUD, L.L.P.
1010 Common Street
Suite 3010
New Orleans, LA 70112-4100

# The Supreme Court of the State of Louisiana

JANE DOE

NO.  2017-CC-1238

VS.

THE ROMAN CATHOLIC CHURCH FOR THE ARCHDIOCESE OF
NEW ORLEANS, LOYOLA UNIVERSITY NEW ORLEANS, AND
USA CENTRAL AND SOUTHERN PROVINCE, SOCIETY OF
JESUS

‒ ‒ ‒ ‒ ‒ ‒

IN RE:  The Roman Catholic Church for the Archdiocese of New Orleans;
‒ Defendant; Applying For Supervisory and/or Remedial Writs, Parish
of Orleans,  Civil District Court Div. C, No. 16-8781; to the Court
of Appeal, Fourth Circuit, No. 2017-C-0289 C/W 2017-C-0291 C/W
2017-C-0292;

‒ ‒ ‒ ‒ ‒ ‒

**November 13, 2017**

Denied.

> MRC
>
> BJJ
>
> JLW
>
> JTG

GUIDRY, J.,  would grant and remand to the court of appeal
for briefing, oral argument and full opinion.

HUGHES, J.,  would grant.

CRICHTON, J.,  would grant and assigns reasons.

Supreme Court of Louisiana
November 13, 2017

Deputy   Clerk of Court
For the Court

EXHIBIT
3

# SUPREME COURT OF LOUISIANA

## No. 2017-CC-1238


NOV 1 3 2017

### JANE DOE

### VERSUS

### THE ROMAN CATHOLIC CHURCH FOR THE ARCHDIOCESE OF NEW ORLEANS, LOYOLA UNIVERSITY NEW ORLEANS, AND USA CENTRAL AND SOUTHERN PROVINCE, SOCIETY OF JESUS

### ON SUPERVISORY WRITS TO THE CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

**CRICHTON, J., would grant and docket and assigns reasons**

I would grant and docket this matter to examine whether plaintiff has met the stringent burden of proof required for renunciation of prescription under La. C.C. arts. 3449, 3450, and 3451.

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NUMBER: 2018-10864                              DIVISION: A-16

JOHN DOE

VERSUS

THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF
NEW ORLEANS, AND DEACON GEORGE BRIGNAC

FILED: _____     DEPUTY CLERK: _____

### JUDGMENT

The Court heard several Exceptions filed by all of the defendants herein in the above

matter on February 27, 2019.

**Present:**

John H. Denenea, Jr. and Richard C. Trahant, attorneys for plaintiff, John Doe;

Dwight C. "Trey" Paulsen III, L. David Adams, Richard A. Bordelon, and Wendy B.
Vitter, attorneys for Defendants, The Roman Catholic Church of the Archdiocese of New
Orleans;

Richard Bullock, attorney for George Brignac;

After considering the law, legal memoranda, evidence, and argument of counsel,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT,

The Exception of Lack of Subject Matter Jurisdiction is OVERRULED;

The Exception of Non-Conformity of the Petition filed by the Archdiocese and the

Exception of Vagueness and Ambiguity filed by George Brignac are SUSTAINED as to the use

of a fictitious name. Plaintiff has fifteen days from the signing of this Judgment to remedy that

deficiency;

The Exception of Non-Conformity of the Petition filed by the Archdiocese as to pleading

fraud with particularity is OVERRULED;

The Exception of Vagueness and Ambiguity filed by the Archdiocese is OVERRULED;

The Exception of Prematurity under LSA-R.S. 9:2800.9 is OVERRULED;

The Exception of Prematurity of Plaintiff's Contract Claims is MOOT;

The Exceptions of No Cause of Action on the claims of: (1) *Respondeat Superior*, (2)

Public Nuisance, (3) Fraudulent Concealment, (4) Negligent Infliction of Emotional Distress,

EXHIBIT
**4**

and (5) Invasion of Privacy, all are OVERRULED;

The Exception of No Cause of Action as to any breach of contract allegations under the Charter for the Protection of Children and Young People ("Charter") is SUSTAINED;

The Exception of No Right of Action is MOOT as the plaintiff concedes he has not alleged any contract based on the Charter.

**JUDGMENT RENDERED IN OPEN COURT ON WEDNESDAY FEBRUARY 27, 2019 AND READ AND SIGNED** on this _____ day of __MAR 1 2 2019__ 2019 in New Orleans, Louisiana.

(Sgd.) ELLEN M. HAZEUR
Judge - Division "A"

_____
HON. ELLEN HAZEUR, DISTRICT JUDGE

*John Doe v. The Roman Catholic Church for the Archdiocese of New Orleans et al.*
No. 2018-10864, Division A-16
Judgment on Defendants' Exceptions Heard on February 27, 2019

Page 2 of 4

(Sgd.) ELLEN M. HAZEUR
Judge, Division "A"
A TRUE COPY

DISTRICT COURT
ORLEANS, STATE OF LA

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NUMBER: 2018-10864

CIVIL DISTRICT COURT
DIVISION "A-16"

JOHN DOE

VERSUS

THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF
NEW ORLEANS, AND DEACON GEORGE BRIGNAC

FILED: _____ DEPUTY CLERK: _____

## RULE 9.5 CERTIFICATE

Undersigned counsel, certifies that he has circulated the proposed judgment to the attorneys for defendants, on Thursday, February 28, 2019 by email and facsimile transmission, at least five working days before the presentation of the Judgment to the Court. Undersigned counsel further certifies that opposing counsel has agreed to the form of the judgment.

Respectfully submitted:

SHEARMAN~DENENEA, L.L.C.

BY: _____ /s/ ___

JOHN H. DENENEA, JR. (#18861)
4240 Canal Street
New Orleans, LA 70119
Telephone: (504) 304-4582
FAX: (504) 304-4587
jdenenea@midcitylaw.com
*Attorneys for Plaintiff*

-AND-

RICHARD C. TRAHANT (# 22653)
ATTORNEY AT LAW
2908 Hessmer Avenue
Metairie, LA 70002
Telephone: (504) 780-9891
FAX: (504) 780-9891
Email: trahant@trahantlawoffice.com
*Attorneys for Plaintiff*

-AND-

COLVIN LAW FIRM
BENJAMIN T. SANDERS (#30842)
MATTHEW R. FRANSEN (#26286)
230 Huey P. Long Avenue
Gretna, LA 70053
Telephone: (504) 367-9001

*John Doe v. The Roman Catholic Church for the Archdiocese of New Orleans et al.*
No. 2018-10864, Division A-16
Judgment on Defendants` Exceptions Heard on February 27, 2019

FAX: (504) 367-0650
Email: bsanders@dcolvinlaw.com
Email: mfransen@dcolvinlaw.com

—

*John Doe v. The Roman Catholic Church for the Archdiocese of New Orleans et al.*
No. 2018-10864, Division A-16
Judgment on Defendants' Exceptions Heard on February 27, 2019

Page 4 of 4

NO. 2019-C-0289

COURT OF APPEAL, FOURTH CIRCUIT

STATE OF LOUISIANA

JOHN DOE

VERSUS

THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS AND GEORGE BRIGNAC

IN RE:        THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS

APPLYING FOR: SUPERVISORY WRIT

DIRECTED TO:   HONORABLE ELLEN M HAZEUR
               CIVIL DISTRICT COURT, ORLEANS PARISH
               DIVISION "A", 2018-10864

**WRIT DENIED**

We decline to exercise our supervisory jurisdiction.

New Orleans, Louisiana this _20th_ day of _May_ _2019_.

_____
CHIEF JUDGE JAMES F. MCKAY III

_____
JUDGE TERRI F. LOVE

_____
JUDGE EDWIN A. LOMBARD

A TRUE COPY
NEW ORLEANS
MAY 20 2019
_____ CLERK
COURT OF APPEAL FOURTH CIRCUIT

EXHIBIT
5





FEEDING THE SOUL FOR





WE'RE PROUD TO SERVE our community with personal, compassionate care. As your Dignity Memorial® professionals, we're dedicated to helping families create a unique and meaningful memorial that truly celebrates the life it represents.

LAKE LAWN METAIRIE
FUNERAL HOME AND CEMETERIES
A proud member of the Dignity Memorial® network

New Orleans | LakeLawnMetairie.com | 504-486-6331

Taking care of each other is what *community* is all about.



EXHIBIT
6



Archbishop
Gregory M.
**AYMOND**

*09/25/2018*

# Bishops Offer Way Forward In Abuse Crisis

👤 *Posted By: Jonelle Foltz  /*
🏷 abuse scandals, Administrative Committee, Archbishop Gomez, Cardinal Daniel N. DiNardo, Cardinal O'Malley, Charter for the Protection of Children and Young People, Pope Francis, USCCB

We all continue to experience sadness as we remember our sisters and brothers who became victims and survivors of sexual abuse by clergy. Once again, I ask you to join me in lifting them to the Lord, that they may know his healing.

Two weeks ago, the Administrative Committee of the United States Conference of Catholic Bishops met in Washington, D.C., and we acknowledged that some bishops by their actions or their failures to act have caused great harm to individuals and to our church, the body of Christ.

Once again, as bishops, we ask forgiveness, both from the Lord and from those who have been harmed.

During the time of our Administrative Committee meeting, Cardinal DiNardo, president of the bishops' conference; Archbishop Gomez, vice president; and Cardinal O'Malley met with our Holy Father, Pope Francis, in Rome. They discussed in detail what has taken place, and the painful aftermath. The Holy Father has promised his prayers and support in this time of purification for the church.

The Administrative Committee has issued the following statement outlining actions within its authority. I also offer some concluding comments below:

*WASHINGTON – The U.S. Conference of Catholic Bishops' (USCCB) Administrative Committee has issued the following statement (Sept. 19) in response to the recent sex abuse scandals. In the statement, the bishops say they pledge to "heal and protect with every bit of the strength God provides us."*

**Turning to the Lord**

"When each of us was ordained as a bishop, we were told:

'Keep watch over the whole flock in which the Holy Spirit has appointed you to shepherd the Church of God.'

We, the Administrative Committee of the United States Conference of Catholic Bishops, assembled Sept. 11-13 in Washington at this time of shame and sorrow. Some bishops, by their actions or their failures to act, have caused great harm to both individuals and the Church as a whole. They have used their authority and power to manipulate and sexually abuse others. They have allowed the fear of scandal to replace genuine concern and care for those who have been victimized by abusers. For this, we again ask forgiveness from both the Lord and those who have been harmed. Turning to the Lord for strength, we must and will do better.

The Administrative Committee took the following actions within its authority:

- **1.** Approved the establishment of a third-party reporting system that will receive confidentially, by phone and online, complaints of sexual abuse of minors by a bishop and sexual harassment of or sexual misconduct with adults by a bishop and will direct those complaints to the appropriate ecclesiastical authority and, as required by applicable law, to civil authorities.
- **2.** Instructed the USCCB Committee on Canonical Affairs and Church Governance to develop proposals for policies addressing restrictions on bishops who were removed or resigned because of allegations of sexual abuse of minors or sexual harassment of or misconduct with adults, including seminarians and priests.
- **3.** Initiated the process of developing a Code of Conduct for bishops regarding the sexual abuse of a minor; sexual harassment of or sexual misconduct with an adult; or negligence in the exercise of his office related to such cases.
- **4.** Supported a full investigation into the situation surrounding Archbishop McCarrick, including his alleged assaults on minors, priests, and seminarians, as well any responses made to those allegations. Such an investigation should rely upon lay experts in relevant fields, such as law enforcement and social services.

This is only a beginning. Consultation with a broad range of concerned parents, experts and other laity along with clergy and religious will yield additional, specific measures to be taken to repair the scandal and restore justice. We humbly welcome and are grateful for the assistance of the whole people of God in holding us accountable.

As these initiatives get underway, the Administrative Committee invites each of our brother bishops to join us in acts of prayer and penance. This is a time of deep examination of conscience for each bishop. We cannot content ourselves that our response to sexual assault within the Church has been sufficient. Scripture must be our guide forward, "be doers of the word and not hearers only" (James 1:22).

In all of this, we do not want anyone – ourselves included – to lose sight of those who have suffered from those who have acted or failed to act as the Gospel demanded. For survivors of sexual abuse, these days may re-open deep wounds. Support is available from the Church and within the community. Victims Assistance Coordinators are available in every diocese to help you find resources. We are grateful to hundreds of dedicated people who, since the adoption of the 2002 Charter for the Protection of Children and Young People, have been working with the Church to support survivors and prevent future abuse.

To anyone who has been abused, never hesitate to also contact local law enforcement. If you don't feel comfortable for any reason with the Church providing help, your diocese can connect you with appropriate community services. With compassion and without judgment, the bishops of the United States pledge to heal and protect with every bit of the strength God provides us.

Acting in communion with the Holy Father, with whom we once again renew our love, obedience and loyalty, we make our own the prayer of Pope Francis in his August 20 letter to the people of God, "May the Holy Spirit grant us the grace of conversion and the interior anointing needed to express before these crimes of abuse our compunction and our resolve courageously to combat them."

**Concluding comments from Archbishop Aymond**

The Administrative Committee acknowledges that this is only a beginning. Further consultation with concerned parents, experts and other laity will assist us in trying to repair the scandal and restore justice.

As always, I extend an invitation to those who have been abused to please come forward and to enable me to walk with you in this time of healing.

In the midst of this sadness, we cannot forget the people who work very hard for the protection of children and young people. Since the Charter for the Protection of Children and Young People was established in 2002, safe environment coordinators and victims assistance coordinators throughout the United States have given of themselves in a very professional and generous way. They have worked to support survivors and prevent future abuse.

It is noteworthy that since the implementation of the charter, the number of cases of abuse has declined sharply.

While this is a beginning, we know that we must continue to strengthen our efforts in this regard. In fact, in the Archdiocese of New Orleans, we are reviewing and revising our 2011 policy on safe environment, "Principles of Ethics and Integrity in Ministry: Code of Ethics."

In the Archdiocese of New Orleans, we will offer a day of prayer for victims and survivors of sexual abuse on a date in the near future.

*Questions for Archbishop Aymond may be sent to clarionherald@clarionherald.org.*

Please follow and like us:

G+



Archdiocese of New Orleans      Office of the Archbishop

7887 Walmsley Avenue
New Orleans, LA 70125-3496
Office: (504) 861-9521
Fax (504) 314-9614
Email: archbishop@arch-no.org

November 2, 2018

To the People of God in the Archdiocese of New Orleans:

Dear Sisters and Brothers in Christ,

To the victims and survivors of sexual abuse, my heart and prayerful support go out to you that you may know God's healing and compassion. Anyone who is a victim or survivor of sexual abuse, please know of my willingness to meet with you so that I may walk with you in healing.

After much prayer and consultation with many people, including the Priests' Council and lay leadership, I have decided to publish the names of Archdiocesan clergy (priests and deacons) who have been removed from ministry for an allegation of sexual abuse of a minor. This report also includes deceased Archdiocesan clergy and religious order priests.

I have received many calls and emails asking me to publish the names. I have also received many calls and emails suggesting not to publish the names. I believe it is the right thing to do in order to foster the healing of victims, in a spirit of transparency, and in the pursuit of justice. Jesus reminds us, "The truth will set you free" *(John 8:32).*

For those against whom the accusation came after their death, a very careful examination took place in order to justify the reporting of the person's name. The more recent cases were and continue to be presented to the Archdiocesan Review Board, an independent board made up of lay experts, who review the cases and make recommendations. For earlier cases, the way in which allegations were reported and investigated varied. This is a weakness that was corrected by the bishops in 2002 with the Charter for the Protection of Children and Young People.

A team of more than ten women and men that included staff and outside legal professionals reviewed the files of 2,432 priests who have served in the Archdiocese of New Orleans since 1950. For priests with accusations received after their death, additional people reviewed the file to ensure accuracy to the extent that is possible after death. Of the 2,432 priests who have served in the Archdiocese of New Orleans since 1950, the review identified 57 who are included in this report. This entire list has been given to the Orleans Parish District Attorney and will be made available to any other District Attorney.

Some will be surprised to see the name of a priest who served in your parish or who you personally knew very well. As you experience this disappointment, I raise you to the Lord and ask him to give you comfort and his peace.



EXHIBIT
7

Since the Charter for the Protection of Children and Young People was established in 2002, the number of cases has been reduced significantly. Most of the accusations are from incidents that occurred decades ago, even as long as 70 years ago. There has not been a substantiated allegation of sexual abuse of a minor committed in well over a decade by a member of the clergy in ministry in the Archdiocese of New Orleans. In the United States during the last two years, there have been eight substantiated allegations of abuse by clergy according to the 2017 Annual Report on the Implementation of the Charter for the Protection of Children and Young People. There are 33,917 priests currently in the United States; therefore, .025% of priests have had substantiated allegations against them.

While just one case of sexual abuse is one too many, these statistics give evidence that our Safe Environment Program of background checks for those who work with minors, trainings for both adults and children, and extensive psychological testing and formation for seminarians has had a very positive impact on protecting our children. One may have the impression from either the media or on social media that such abuse is rampant in our churches and schools today. This is simply untrue.

I would be remiss if I did not extend my heartfelt gratitude to the very good and faithful clergy who serve in the Archdiocese of New Orleans. Daily, they give of themselves to lead and serve God's people. My brothers, thank you as you continue to shepherd God's people today. I also thank all those who support our clergy and appreciate their ministry.

We have done our very best to make this report as accurate and complete as possible. If anyone wishes to raise a question about someone not on the list, I invite you to come forward. The phone number for Victims Assistance Coordinator Br. Stephan Synan, F.M.S. is (504) 522-5019. If necessary, the list will be updated if other cases are presented.

For our sins of the past, we ask for your forgiveness and the mercy of God. Our sin is public and it calls us as church leaders to repentance in order that our church can experience renewal. As a church, our rock foundation is Jesus Christ. It is His church and has been for over 2,000 years. In spite of our sins, He will not desert the church but will lead us towards healing and renewal.

Wishing you God's peace, I am

Sincerely in Christ,

Most Reverend Gregory M. Aymond
Archbishop of New Orleans



# Articles

### Church Still Challenged to Deal with Clerical Abuse of Minors

By Beth Griffin

The church has made significant progress in dealing with clerical sexual abuse of minors, but it must continue to be vigilant because healing is a long-term process. Part of the challenge is to incorporate the *Charter for the Protection of Children and Young People* into the fabric of church life.

Since 2002, dioceses have taken unprecedented steps to confront the issue, assist the victims, seek forgiveness, ensure the safety of minors, and restore credibility.

Healing of victims is a primary concern moving forward, said Bishop Gregory Aymond of Austin, Texas, chair of the U.S. bishops' Committee for the Protection of Children and Young People. "First and foremost, we must reach out to those who have come forward and look for those who have not. We have to give them love and be a source of healing." Some victims want to deal with the issue on their own, but "others cannot and should not."

The church also needs to let people know what efforts have been made.

"The church is the only group that has undertaken a comprehensive program to educate children and the people who work with them," said Archbishop Harry Flynn of St. Paul and Minneapolis, chairman of the Ad Hoc Committee on Sexual Abuse (which became the Committee for the Protection of Children and Young People). "There is a huge success story to tell, and we've told it, but I don't know if anyone is listening."

The success includes safe environment training for more than six million people and background evaluations for more than 1.6 million people who work with children in the church, according to Teresa Kettelkamp, executive director of the USCCB Secretariat of Child and

1



EXHIBIT

4

Youth Protection. The training is a centerpiece of the *Charter*, which the bishops adopted and called to be implemented in each of the 195 dioceses in the United States.

"We are challenged to be vigilant," said Archbishop Wilton Gregory of Atlanta, former USCCB president. "We're dealing with a situation that may have taken many years to come to the surface. We have to be vigilant that we are doing the right thing as we move forward and not grow despondent that the issue has not been completely settled. The victims and their families have been deeply hurt and still need our support."

Archbishop Gregory recalled being asked: "How long is this going to go on?" "In truth," he replied, "it will be years. It won't make headlines, but the process of healing will go on for the rest of my episcopate. I will be responding to the needs of people."

"We have apologized and we want the church to be purified," said Bishop Aymond. "Our leadership has been challenged and our credibility has been lost. We have to restore credibility by proving that we are honest and straightforward. Credibility requires words and, more importantly, actions, and it takes time." Specifically, he said, "We have to live out the spirit and letter of the *Charter*. We must reach out to victims and do justice, and we have to fulfill the mandate of Pope John Paul II, who said, 'There is no place in the priesthood or religious life for those who would harm the young.'"

If there is any possible silver lining to the dark cloud of the abuse crisis, it may be, as Bishop Aymond said, that "the sexual abuse crisis in the church uncovered the fact that sexual abuse in the United States is far more common than we imagined."

"We have an opportunity to be agents of change for the society," he said. "Our *Charter* gives some guidance on how we expect situations to be dealt with, and we have developed the safe environment program," which can be used as a model for others.

# # #

**Growth in Transparency Marks Church**

By Joe Towalski

William Gavin knows the skeptics are still out there.

The head of the Gavin Group, which has conducted annual audits of U.S. dioceses since the bishops passed their *Charter for the Protection of Children and Young People* in 2002, acknowledges that a little skepticism is a good thing when it comes to monitoring compliance to programs designed to prevent child sex abuse.

But, Gavin added, the time has come for doubters to acknowledge that the Church has made considerable progress on the issue.

"The Catholic bishops are the only group in the United States that has stood up and said, 'OK, here's our problem,'" Gavin said. "Maybe they were pushed into it a little in the beginning, but they've embraced it, and now they're driving it because it's the right thing to do. I think that's part of what the church should be about."

Gavin and others who have worked closely with the church during the last several years say it is making strides to be more transparent and accountable.

In addition to the *Charter*, for example, the bishops established a National Review Board of lay people to independently monitor how their child safety policies are implemented. The board commissioned a study, first published in 2004, documenting the nature and scope of the sexual abuse crisis. A further study will focus on the causes and contexts of the crisis.

Yearly reports of *Charter* compliance based on the audits, coupled with annual reports from the Center for Applied Research in the Apostolate (CARA) at Georgetown University regarding the number of old and new abuse cases, have "proven to be an excellent example of transparency," said Kathleen McChesney, former executive director of the bishops' Secretariat of Child and Youth Protection.

In addition to the national figures, dioceses that publish more detailed local reports about abuse cases "are extremely important to this initiative," said McChesney, who is also a former executive assistant director of the Federal Bureau of Investigation. "Those bishops who are open and transparent about allegations . . . are admired for their candor and have obviously gained or regained the trust of the laity."

3

Gavin said the church has come to see organizations like his as an ally, not an enemy, in the common cause of making the church a safer place.

"The people in the pews now also understand in a broader fashion what it is the church really does," he said. "A lot of people received the sacraments and attended Mass, and that was about as much as they knew about their church. Now they understand codes of conduct, and they understand how to report child abuse cases, and they understand a whole lot more about their church. I think [the church] is becoming more participatory."

One way Catholics have become more participatory is through mandatory diocesan programs that help to train and educate children and adults—from bishops to lay volunteers—in creating and maintaining safe environments.

"I think this has been a learning process for all of us in the church—first of all simply to have become aware of the signs and signals of abuse," said Bishop William Skylstad of Spokane, Washington, president of the United States Conference of Catholic Bishops (USCCB) from 2004 to 2007.

"We're far more astute now than we were, say 15 or 20 years ago," he said. "I think across the board we've learned that sexual abuse of children occurs not only in the church, but everywhere, and that's really important. I think that people are now better prepared to spot abuse and to provide a safe environment."

The church also is working to make further improvements in the area of child safety, Gavin said. Compliance auditors who ask questions of bishops and other church officials are also being sent into parishes to ask questions and verify information, Gavin said.

"More and more I'm hearing bishops and their staffs say, 'We have a program whereby we go out and audit parishes,'" he added. "I couldn't be more thrilled with that. That's exactly the way we have to go."

### #

4

**Working to Heal Hurts**

By Robert Delaney

Overcoming being hurt by someone in the Church can be a long process—even a life-long process—say experts in dealing with victims of clergy sexual abuse. But the Catholic Church stands ready to help victims obtain professional counseling.

In many ways, the healing process parallels what would be involved in the case of abuse by someone in any institution—schools or government, for example. But it also has its special aspects, because for the survivor of clergy abuse "the Church represents God," says Michael Morton, executive director of Guest House Institute in Lake Orion, Michigan. The Institute is an educational and training program of Guest House, known for its addiction treatment programs for clergy and religious.

Since the adoption of the *Charter for the Protection of Children and Young People* by the United States Conference of Catholic Bishops (USCCB) in 2002, the Church has generally done a better job of dealing with offenders and helping victims than have other institutions, such as police and schools, Morton says.

Survivors of clergy abuse are now not only heard but credited; action is taken to deal with culprits; and there is not only an expression of contrition, but also the offer of concrete assistance. There are, however, some exceptions, "and some people in leadership positions still need to understand better the gravity of the situation," he says.

One diocese that figured prominently in the clergy abuse scandal has had one of the most active programs to help survivors.

"In the Archdiocese of Boston, over 700 survivors or their family members have contacted us, and 464 have received support from the archdiocese for therapy," says Barbara Thorp, director of the archdiocese's Office of Pastoral Support and Outreach. Many survivors of clergy sexual abuse suffer from conditions such as post-traumatic stress disorder, chronic anxiety, depression, or addictions, and some have difficulties on the job or problems with family relations, she continues.

The archdiocese also pays for psychopharmaceuticals that might be prescribed. The willingness to pay for independent licensed therapists and prescriptions is without regard to any litigation the victims might be pursuing against the archdiocese.

While many people have benefited from counseling or therapy, healing the spiritual damage survivors have suffered remains "such uncharted territory" that there is no single path indicated, Thorp says. When a priest or other church employee becomes a "faith-destroyer rather than a faith-nurturer," the results can be soul-searing. "This is probably the most profound aspect of the problem," Thorp says.

Considering how abuse often also involved the profaning of a sacrament—in the confessional or in the sacristy before or after Mass—the fact that many survivors do manage to overcome the damage to their spiritual relationship is testimony "to the remarkable resilience of true faith," she adds.

Sister Sheila McNiff, a Sister of the Holy Child Jesus and the victim assistance coordinator for the Archdiocese of Los Angeles, understands how hard the healing process can be from listening to hundreds of survivors. "I have felt like a container for the rage that is so deep and so destructive of a person's being. I have silently watched them as they angrily enter counseling. Then some join or start support groups and eventually struggle to talk with their family and friends about their pain and shame," she says.

Morton says individual cases vary, depending on the extent, duration, and severity of abuse, as well as the person's age when the abuse began, so there's no single formula for successfully dealing with them. But he says the entire church—not just the leadership—can resolve that all future contacts with the church will be characterized by trust.

Thorp points to efforts in Boston. Not only is there a monthly Mass in the cathedral chapel for victims and survivors of clergy sex abuse, but Cardinal Sean O'Malley also led a nine-day Pilgrimage of Repentance and Hope in 2006 to churches that had experienced abuse incidents. "Cardinal O'Malley also invited the priests in attendance to prostrate themselves with him while a litany was sung in a true expression of atonement," she says.

### #

**Healthy Child Protection Programs Age-Appropriate, Ongoing**

By Peter Feuerherd

Catholic leaders in parishes and schools acknowledge a sad reality of modern life: Protecting children from sexual predators cannot be taken for granted.

The result: Education programs and new regulations to protect children are being instituted throughout U.S. parishes and Catholic schools.

What makes such programs healthy and effective?

Pam Church, vice president of parent education for Childhelp, an organization that addresses the needs of abused and neglected children, notes that education on child protection should be age-appropriate and ongoing.

"One-shot deals don't work," she says. Children need to get the message that abuse is not their fault. They also need to be taught skills to promote their own protection. At the same time, education on protecting children should be "inviting and kind" with a focus on the message that "God wants people to be safe and have happy lives."

Parents, she says, should teach children on a regular basis about asserting themselves, just as they teach them to eat their vegetables. Parish and school child protection programs need to enlist parents, who have the best interests of their children at heart.

Training programs for teachers and other professionals should empower children to say "no" to those who would take advantage of them. For very young children, education should emphasize the dangers of inappropriate touching while acknowledging that "most touches are good touches and that most people don't harm children." As children grow into early teen life, they should be encouraged to come forth with questions about the kinds of touch that make them feel uncomfortable.

"Why does it feel so icky?" "Why am I so confused?" These are the kinds of questions that children ask when they are being abused, says Church, who says that child protection programs should focus on encouraging troubled youngsters to come forward.

Monica Applewhite, former president of religious services for Praesidium, a Texas-based firm that consults with organizations developing child protection policies, says good child protection programs emphasize the urgency of acting to intervene in potentially abusive situations. One problem is that seemingly minor behavior that makes people uncomfortable is

often socially awkward to point out. People usually feel there are two alternatives: dismiss the offending party or do nothing.

That's why, she says, it's important to have well-established rules regarding adult-children behavior in any educational or youth setting. For example, wrestling, making rude or suggestive comments, and encouraging children to address adult leaders by their first names can all be red flags suggesting even more inappropriate behavior.

Those who violate these rules can be talked to gently once the regulations are in place. For example, an adult supervisor in a youth program can gently be told, "We have a policy against wrestling with children."

According to Applewhite, it's easier to say that than it is to start accusing someone of being a sex abuser when there is no clear evidence.

"You can create an environment where abusers are not comfortable," she says. When regulations are in place, the early-warning behaviors of abusers can be curtailed. Good policies can define boundaries. The goal is not to ignore problem behavior.

Stereotypes of abusers need to be confronted. Often, notes Applewhite, there is a tendency to make sex abuse a simple case of bad people doing bad things.

Abusers are often, paradoxically, very concerned about children and often do valuable work. They can develop a reputation for good work with young people. There is even a tendency among some in a community to defend offenders once they have been exposed, because their reputations can be so positive.

The fact is, notes Applewhite, evil and good can exist in the same person.

Since appearance doesn't provide many useful clues, detection "has to be about what the person does," says Applewhite. Serious warning signs include children spending the night alone with an adult authority figure, or children getting pot or alcohol from an adult. Older children, she notes, can be taught about the patterns that sexual abusers will use to dupe their victims. Teens, she says, are wary of being educated simply about safety concerns. They will respond to an approach that counsels them about the dangers of being duped by a predator. No one in that age group wants to be known as an easy mark.

###

**Learning from Clergy Abuse of Minors Scandal Can Help Others**

By Joseph Young

The clergy sexual abuse scandal that rocked the U.S. Catholic Church five years ago was a painful period but a teachable moment. Healing and preventive measures have gained momentum since the U.S. bishops adopted the *Charter for the Protection of Children and Young People* in June 2002 and formed an independent National Review Board.

Subsequently across the nation, in accordance with the *Charter*, diocesan review boards have been formed, safe environment programs put into place, annual audits on abuse implemented, and procedures for more careful screening of priesthood candidates adopted at seminaries.

There is also much that others can learn too, said Bishop Gregory Aymond, chair of the USCCB's Committee for the Protection of Children and Young People and bishop of the Diocese of Austin, Texas. He noted that two other Christian denominations and one school system already have asked his committee how to deal with sexual abuse by those in authority.

Ann Riggs, PhD, a member of the Religious Society of Friends (the Quakers) and associate general secretary for Faith and Order for the National Council of Churches of Christ in the U.S.A., said that from the Catholic Church's experience with clergy sexual abuse, other churches have learned that ignorance is no excuse.

"You have to educate yourself so you are not naive," she said. Another lesson learned, Riggs said, is that supervisors cannot give candidates for positions in Church leadership the benefit of the doubt and dismiss questions about their background.

"You can't just assume their mental health and spiritual honor," she said. Finally, Riggs said, churches have learned from the Catholic experience that abuse compromises an institution's capacity to carry out its mission. Some funding for ministries is diverted to legal fees and settlements for victim/survivor counseling. Also, in a church wracked by scandal, those in the pew, if they remain in the pew, are less likely to contribute monetarily.

But it is not only institutions that can learn from the Catholic Church's experience, Bishop Aymond said.

"At every level of society, consciousness has been raised about sexual abuse. More and more, even families sitting around the table are discussing it openly," he said.

9

One topic is the importance of being vigilant, which Bishop Aymond said is perhaps the primary lesson to learn.

"You need to be very, very vigilant about picking up any signals that sexual abuse may be occurring," he said.

Robert Bennett, Washington attorney and charter member of the National Review Board, said, "People need to realize that child abuse occurs in all sorts of places; you can't be self-righteous and say, 'It can't happen here.'"

Closely related to vigilance is prevention. One preventive measure to be learned, Bennett said, "is not to allow dysfunctional men into the clergy."

Bennett warned against using the "geographic cure"—which is no cure at all—of moving abusive pastors to other churches, and he also advised against "burying the abuse for fear of scandal, only to have a bigger scandal emerge" when the abuse is eventually revealed.

Another lesson is the importance of transparency and truth.

When allegations of abuse are made, Bishop Aymond said, the first order of business is to "find the truth of the matter" by prayerfully listening to all sides without bias.

All allegations must be investigated, Bennett said. Bishops, or whoever is in authority, must meet with victims and, in the process, not assume that they are not telling the truth. "You don't want to act like you're some risk assessment manager for an insurance company," he said.

### #

**Preventing and Identifying Child Sexual Abuse**

By John Gehring

Safe environment coordinators, researchers, and psychologists agree there is no definitive profile of a child sexual abuser. Instead, these experts speak about patterns of behavior, or "red flags," that should alert adults that a young person may be in an abusive situation.

"If you start looking for a typical abuser in your mind, you are going to miss a lot of people," said Paul Duckro, the director of the Office of Child, Adolescent, and Adult Protection in the Diocese of Tucson, Arizona. "Your net will have a lot of holes in it."

A former medical school professor who specializes in the behavioral aspects of illness, Duckro said that people who are unusually secretive, shun supervision, or demand special rules that do not apply to others should raise concerns.

Sexually inappropriate behavior with a child often begins with a process psychologists call "grooming"—often subtle actions that can make children feel special, protected, and comfortable in situations that may lead to more deviant activities.

An adult could be grooming a potential victim, for example, when he or she frequently singles a child out for special gifts or looks for opportunities to be alone with a child. Abusers often attempt to view pornography or use alcohol with children to create intimacy and trust. While abusers cannot be easily classified and will demonstrate a range of personality types, Duckro pointed to a common characteristic they do share.

"Narcissism is a concern, with my needs at the exclusion of yours," he said. "There is no empathy for other people or their needs."

Msgr. Stephen Rossetti, the president and chief executive officer of St. Luke Institute, a Silver Spring, Maryland, residential treatment center for priests and religious who have psychological problems, believes the media has presented a caricatured view of abusers.

"The media has reinforced stereotypes like the 'dirty old man' when in reality there are many kinds of offenders," said Msgr. Rossetti, a licensed psychologist. Despite their differences, he said, abusers do generally fit into subtypes that include the compulsively sexual person, the narcissist who uses others for pleasure, and the dependent person who is emotionally immature.

"Red flags" include adults who do not respect a child's physical or emotional boundaries, lack peer relations, exhibit extremes in sexual experiences, show confusion about their sexual

11

orientation, or have a personal history of childhood sexual abuse. He was quick to note, however, that most adults who have been abused as children do not grow up to be abusers.

Msgr. Rossetti believes the Catholic Church has come a long way in addressing sexual abuse and points to the *Charter for the Protection of Children and Young People*.

"Right now the Catholic Church has one of the strongest anti-abuse policies of any organization in the country," he said. "But one case of abuse is always too many."

Karen Terry, an associate professor at the John Jay College of Criminal Justice, the City University of New York, said there are several biological and psychological theories for why adults sexually abuse children.

"The most important point is that abusers constitute a heterogeneous population of individuals who begin abusing for a variety of reasons," she said. "In addition, there is no clear 'best practice' as to how to treat or manage abusers, largely because the treatment and management plans should be tailored to their specific needs and risks. The best that I can recommend for prevention of child sexual abuse is education."

# # #

**Priest and Parishioner: Walking Side by Side**

By Jane Harriman

After reading the profile of his new parish and meeting some of its leadership, the pastor went to dinner with a brother priest, who inquired, "So how do you think it will go?"

"Not well," the pastor replied, feigning dismay. "Who can walk on water? The Lord Jesus Christ himself couldn't meet their expectations."

Priests may joke among themselves of the impossible relationship a parish expects to have with its new pastor, but in most cases, they are just joking.

"When I commission or assign a newly ordained priest for the first time, I tell him that to be successful two things are required: to be present and to be pleasant. The people are not really looking for much more than that—someone to follow them from cradle to grave, to be with them on their journey," says Bishop Michael A. Saltarelli of the Diocese of Wilmington, Delaware.

Bishop Saltarelli believes that the relationship between pastor and parishioners remains at heart as close as it always has been. Despite the sex abuse scandal, despite a society that seems focused on Hollywood and Wall Street, despite fewer priests and more Catholics in more parishes.

Not all agree. Post sex abuse crisis, the relationship between youth and pastor may be suffering, notes Msgr. Stephen Rossetti, psychologist and president of the St. Luke Institute, a Silver Spring, Maryland, education and research center for priests and religious with mental or emotional problems or addictions.

"I think priests are more reticent about dealing with minors. I know I certainly am and I think my brother priests are," Msgr. Rossetti says. "If I were taking a whole group of boys camping and I couldn't get another adult to go with me, I wouldn't take them by myself."

Bishop Saltarelli would advise priests not to let the lingering wounds and anxieties of the sex scandal prevent them from reaching out to children and young people.

Certainly with children, Bishop Saltarelli says, one always exercises prudence and reaches out to them "always in the company of their parents. But children naturally want to hug their priest. When that happens, I don't walk away."

Father Clete Kiley describes the role of a pastor as multi-layered and subject to misunderstanding even among those of the Catholic tradition. "He is a teacher and probably best

13

known to his people through the Eucharist and other sacraments. He is a spiritual bridge, a father. In some ways he is the icon of Jesus himself. That's something priests are mindful of."

Father Kiley, formerly a pastor in the Archdiocese of Chicago and a seminary dean, is now president of the Faith and Politics Institute in Washington, D.C., an interfaith, bipartisan agency that helps members of Congress approach their work spiritually. Before that, he was executive director of the Secretariat for Priestly Life and Ministry for the United States Conference of Catholic Bishops, where he served on the sexual abuse crisis management team and helped create the National Review Board and Office of Child and Youth Protection.

In administering the sacraments of the Church, Father Kiley says, a priest stands "*in persona Christi*," in the place of Christ—saying in the Sacrament of Reconciliation, for example, "I absolve you," when it is God who gives absolution.

"If we are transparent enough, what the people see is Christ. I think that is the essential bond between the pastor and the people." A priest, Father Kiley says, is human and has human faults and failings: "Part of me is sinful and broken," and that part he steps around in administering the sacraments. In celebrating the Eucharist, Father Kiley says, after the consecration, "when the priest kneels, that gesture shows that I was acting in God's person but I am not him."

# # #

**Child Sexual Abuse in the United States: Problems, Progress**

By Kate Blain

Reports of child sexual abuse are on the increase, and that's a plus. That it still is underreported is a problem. So say experts who deal with abused children.

Getting to the truth is not easy.

David Finkelhor, PhD, director of the Crimes Against Children Research Center (CCRC) at the University of New Hampshire, seems to sum up the problem of evaluating child sexual abuse in the United States in one sentence: "There is no single source for statistics on child victimizations."

The statistics may be improving, but they are still disturbing. According to a 2001 National Crime Victimization Survey, 1.9 of every 1,000 children in the United States are raped or sexually assaulted each year. CCRC studies estimate that from 1990 to 2003, the number dropped from 2.3 per 1,000 children to 1.2. That's a 46 percent drop in substantiated cases, but it still leaves children sexually assaulted at a rate three times higher than that for adults.

Better abuse reporting means "something's working," stated Finkelhor. He attributed the decline in cases to economic improvements, prevention efforts, incarceration of offenders, and the use of psychiatric medications for both juvenile and adult offenders.

Marsha Gilmer-Tullis of the National Center for Missing and Exploited Children added to that list the fact that teachers, law enforcement officials, and medical personnel are now mandated reporters—required by law to report suspected abuse.

Education is the key, she said. Where children were once told to avoid strangers, families now understand that abusers are more often known to a child than not.

Charol Shakeshaft, PhD, of Hofstra University, studies sexual abuse by educators and broke down the statistics as follows: 25 percent of child sexual abuse is perpetrated by a parent or "parent substitute"; another 25 percent is by other relatives; and the rest is mostly by acquaintances. Only a small percentage of abusers are unknown to their victims.

Child sexual abuse crosses all boundaries of race or age. Girls are abused much more often than boys, composing 78-89 percent of victims. A third of those who perpetrate sexual abuse on children are juveniles themselves.

Whether socioeconomic status plays a role in abuse likelihood is debatable; but the experts agreed that whatever factors cause a child to be vulnerable can contribute to sexual

abuse. Finkelhor cited parental alcoholism and marital conflict as contributing factors. A major U.S. research project, the Adverse Childhood Experiences (ACE) study, pointed out that "household dysfunction" such as domestic violence, mental illness of a parent, or drug use in a child's home often went hand-in-hand with sexual abuse occurrence—abuse that, in turn, was revealed to "have a powerful relation to adult health a half-century later."

"If you're a child being bullied, your family's struggling, [or] your esteem is not as high as it should be, you're vulnerable to being groomed or seduced by somebody who's able to hook into those insecurities," Gilmer-Tullis concluded.

"Individuals who are going to prey on children are going to put themselves in situations where they have access to children. That could be anything [from] volunteering [to] sports programs," said Gilmer-Tullis.

Perpetrators of sexual abuse, most of whom are male, speak a language that vulnerable children often want to hear. Gilmer-Tullis recalled instances in which predators acted appalled at a parent's limits on a child, telling the child, "But you're so mature." Abusers also build trust by claiming to understand the child better than anyone else and flattering their victims with compliments.

Shakeshaft split sexual abusers into two categories: fixated abusers, who get their sexual gratification from children and are hard to stop from acting out; and opportunistic abusers, who are less likely to commit abuse when closely supervised.

Programs that focus on teaching children and those around them to guard against sexual abuse seem to be having positive effects. Shakeshaft's studies on sexual abuse by educators list points to make with children, from avoiding adults who want to spend time alone with them to becoming aware that behavior changes in their friends might indicate that they have been abused.

"Rumors are an important source of information on educator sexual misconduct," she noted in one study.

Finkelhor believes that better abuse reporting can be encouraged by making the process easier on the victim—"decreasing the burden and trauma of the investigation."

"Speed up the investigation and trial; make sure the kids are interviewed by sensitive and trained individuals; reduce the likelihood of retaliation [by abusers]; make sure [victims] get counseling in the aftermath," he added.

###

**Seminary Screening Early Step for Healthy Priesthood**

By Emilie Lemmons

Since the sexual abuse scandal unfolded dramatically in public view in 2002, Catholic seminaries have refined their admissions screening with more emphasis on attracting healthy candidates and keeping problematic ones out of the priesthood. Interviews examining candidates' sexual and dating histories are more common and thorough, for example, and diocesan vocations offices do a better job of filtering out men who don't make the grade before they even apply to the seminary.

"Not only are seminaries conducting careful psychological assessments, including assessments of a candidate's psychosexual maturity and capacity for chaste celibacy, but they are also providing an integrated program of formation in the area of human sexuality," said Msgr. Jeremiah McCarthy, director of accreditation and institutional evaluation for the Association of Theological Schools, based in Pittsburgh.

The stronger emphasis is reflected in the newest version of the *Program of Priestly Formation*, released by the U.S. bishops in 2006, Msgr. McCarthy said. The program governs seminary formation in the United States.

Officials are quick to point out, however, that the church has been working to strengthen seminary screening and formation for more than a decade.

Msgr. Stephen Rossetti, a psychologist who heads the St. Luke Institute, a Silver Spring, Maryland, residential treatment center for priests and religious with psychological problems, has seen a "modest increase in the amount of help" seminaries have requested since the early 2000s.

A trend noticed at the seminary level is that potential priesthood candidates are examined more thoroughly by diocesan vocations offices before they apply to the seminary.

"The dioceses that send us candidates are doing a much better job of screening before they come to see us," said Sulpician Father Gerald Brown, who became rector of St. Patrick Seminary in Menlo Park, California, in 2004.

It's an extra level of scrutiny that wasn't there a few years ago, he said. "In the past, a diocese might say, 'We're not sure about this guy, but let's send him, and the seminary can screen him out.' Now, they don't send him if they're not sure about it."

To be accepted into a seminary, all men seeking the priesthood must undergo standard psychological tests, such as the Minnesota Multiphasic Personality Inventory and the Rorschach inkblot test. But those don't necessarily detect potential molesters, Msgr. Rossetti said.

In his consultations with seminaries, he said, he encourages them to include a "full, in-depth psychosexual history." A trained clinician sits down with each candidate and asks him about his sexual and relationship history. Questions range from queries about the man's sexual orientation to his dating life.

The clinician looks for a number of typical scenarios that might suggest a man is a higher risk for being a sexual abuser. Men who are emotionally regressed and immature raise a red flag. So do men who have been victims of abuse themselves and seem stuck in their victimhood. Compulsively sexual individuals, narcissists, and passive or dependent men who don't have healthy peer relationships also warrant further scrutiny, he said.

# # #

**Victim Assistance Coordinators: They Gotta Have Heart**

By Mary Hart

It's the rare job description that includes the word "compassionate," yet a crucial part of a victim assistance coordinator's job is to respond compassionately to the victims of abuse whom they assist. Since 2002, in compliance with the bishops' *Charter for the Protection of Children and Young People*, a victim assistance coordinator has been on staff in virtually every diocese in the country.

The description of duties is threefold—to assist abuse victims in making a formal complaint of abuse to the diocese, to help arrange a personal meeting with the bishop or his representative, and to obtain support for the victim's specific needs.

The root of the word "compassion" means to "to suffer with," and the word has been expressed at its deepest level in the Archdiocese of Boston, where the child abuse scandal has left deep wounds. In her role as director of the Office of Pastoral Support and Outreach, Barbara Thorp of the Archdiocese of Boston—hired in her position shortly after the child abuse scandal became public in early 2002—speaks of the "myriad ways" the clergy sexual abuse has traumatized the abuse survivors, their families, the church, and the community as a whole, even non-Catholics.

She describes herself as "privileged" to work with survivors (she prefers the word "survivors" to "victims") and expresses her deep respect for them and their families. "It takes an extraordinary amount of trust," she says, "for survivors of clergy abuse to call upon our office for help. We're honored to be able to do what we can to help those who've been so hurt."

Those who contact the office are often referred by their attorneys, but some become aware of the assistance through the archdiocesan Web site or from therapists or social workers. Every claim of sexual abuse is taken seriously. The victim assistance coordinator does not investigate a case. Every complaint reported to the office is referred to the state attorney general. Most victims want their name included in the report, but they may file anonymously if they prefer.

Thorp is available to those impacted by the abuse to help them find therapy and set up a meeting with Cardinal Sean O'Malley. A staff person from the office accompanies the survivors and their families when they meet with the cardinal. According to Thorp, most survivors and their families welcome the opportunity to tell the cardinal what happened and the impact the

19

abuse has had on their lives. They find it important to express the spiritual suffering and alienation they've experienced.

Not only does the victim assistance coordinator's office help find therapists for survivors, but the archdiocese pays for survivors' therapy. In 2007, the Boston office supported 285 survivors in therapy, spending over $1.1 million. Since the office opened, it has served more than 700 people.

In his four and a half years at the Archdiocese of Milwaukee, Wisconsin, Archbishop Timothy Dolan has met with 40 victims. Victim assistance coordinator Amy Peterson offers to set up a meeting once a victim enters the diocese's mediation program. According to Archbishop Dolan, some victims choose not to participate themselves but instead request a meeting with him for their parents or spouses, who also suffer "terrible pain and grief."

In the Los Angeles archdiocesan office of Victim Assistance Ministry, Sister Sheila McNiff, a Sister of the Holy Child Jesus and the victim assistance coordinator, focuses on reports of current and past abuse by clergy, paid staff, and volunteer personnel at parishes and schools in the archdiocese. She also works with families and individuals abused outside the parish or school. Her office makes referrals for spiritual direction, pastoral counseling, individual and couples therapy, drug and alcohol rehabilitation, and trauma recovery groups.

As in Boston, each survivor in Los Angeles is offered the opportunity to receive an apology from the head of the archdiocese. One of Sister McNiff's duties is to help arrange a meeting between Cardinal Roger Mahony of Los Angeles and every victim in litigation. Currently, more than 580 people are in litigation in the archdiocese, so, she says, "it will take some time, but the firm commitment has been made to see each survivor."

# # #

# PROMISE TO
# PROTECT



# PLEDGE TO
# HEAL

**Charter for the Protection of Children and Young People**

**Essential Norms for Diocesan/ Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons**

**A Statement of Episcopal Commitment**

● *Revised June 2018* ●

United States Conference of Catholic Bishops



EXHIBIT
9

The revised *Charter for the Protection of Children and Young People* was developed by the Ad Hoc Committee for Sexual Abuse of the United States Conference of Catholic Bishops (USCCB). It was approved by the full body of U.S. Catholic bishops at its June 2005 Plenary Assembly, and this third revision was approved at the June 2018 Plenary Assembly. The revised *Essential Norms for Diocesan/Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons* was developed by the Ad Hoc Committee on Sexual Abuse of the USCCB and by the Vatican-U.S. Bishops' Mixed Commission on Sex Abuse Norms. They were approved by the full body of bishops at its June 2005 General Meeting, received the subsequent *recognitio* of the Holy See on January 1, 2006, and were promulgated May 5, 2006. The revised *Statement of Episcopal Commitment* was developed by the Ad Hoc Committee on Bishops' Life and Ministry of the USCCB. It was approved by the full body of U.S. Catholic bishops at its November 2005 Plenary Assembly and then again in 2011 and 2018. This revised edition, containing all three documents, is authorized for publication by the undersigned.

Msgr. J. Brian Bransfield
General Secretary, USCCB

Scripture texts used in this work are taken from the *New American Bible*, copyright © 1991, 1986, and 1970 by the Confraternity of Christian Doctrine, Washington, DC 20017 and are used by permission of the copyright owner. All rights reserved.

Copyright © 2002, 2011, 2018, United States Conference of Catholic Bishops, Washington, DC. All rights reserved.

# Charter for the Protection of Children and Young People

## Preamble

Since 2002, the Church in the United States has experienced a crisis without precedent in our times. The sexual abuse[1] of children and young people by some deacons, priests, and bishops, and the ways in which these crimes and sins were addressed, have caused enormous pain, anger, and confusion for victims, their families, and the entire Church. As bishops, we have acknowledged our mistakes and our roles in that suffering, and we apologize and take responsibility again for too often failing victims and the Catholic people in the past. From the depths of our hearts, we bishops express great sorrow and profound regret for what the Catholic people have endured.

We share Pope Francis' "conviction that everything possible must be done to rid the Church of the scourge of the sexual abuse of minors and to open pathways of reconciliation and healing for those who were abused" (Letter of His Holiness Pope Francis to the Presidents of the Episcopal Conferences and Superiors of Institutes of Consecrated Life and Societies of Apostolic Life Concerning the Pontifical Commission for the Protection of Minors, February 2, 2015).

Again, with this 2018 revision of the *Charter for the Protection of Children and Young People*, we re-affirm our deep commitment to sustain and strengthen a safe environment within the Church for children and youth. We have listened to the profound pain and suffering of those victimized by sexual abuse and will continue to respond to their cries. We have agonized over the sinfulness, the criminality, and the breach of trust perpetrated by some members of the clergy. We have determined as best we can the extent of the problem of this abuse of minors by clergy in our country, as well as its causes and context. We will use what we have learned to strengthen the protection given to the children and young people in our care.

We continue to have a special care for and a commitment to reaching out to the victims of sexual abuse and their families. The damage caused by sexual abuse of minors is devastating and long-lasting. We apologize to each victim for the grave harm that has been inflicted on him or her, and we offer our help now and for the future. The loss of trust that is often the consequence of such abuse becomes even more tragic when it leads to a loss of the faith that we have a sacred duty to foster. We make our own the words of St. John Paul II: that the sexual abuse of young people is "by every standard wrong and rightly considered a crime by society; it is also an appalling sin in the eyes of God" (Address to the Cardinals of the United States and Conference Officers, April 23, 2002). We will continue to help victims recover from these crimes and strive to prevent these tragedies from occurring.

Along with the victims and their families, the entire Catholic community in this country has suffered because of this scandal and its consequences. The intense public scrutiny of the minority of the ordained who have betrayed their calling has caused the vast majority of faithful priests and deacons to experience enormous vulnerability to being misunderstood in their ministry and often casts over them an undeserved air of suspicion. We share with all priests and deacons a firm commitment to renewing the integrity of the vocation to Holy Orders so that it will continue to be perceived as a life of service to others after the example of Christ our Lord.

We, who have been given the responsibility of shepherding God's people, will, with his help and in full collaboration with all the faithful, continue to work to restore the bonds of trust that unite us. We have seen that words alone cannot accomplish this goal. We will continue to take action in our Plenary Assembly and at home in our dioceses and eparchies.

We feel a particular responsibility for "the ministry of reconciliation" (2 Cor 5:18) which God, who reconciled us to himself through Christ, has given us. The love of Christ impels us to ask forgiveness for our own faults but also to appeal to all—to those who have been victimized, to those who have offended, and to all who have felt the wound of this scandal—to be reconciled to God and one another.

Perhaps in a way never before experienced, we feel the power of sin touch our entire Church family in this country; but as St. Paul boldly says, God made Christ "to be sin who did not know sin, so that we might become the righteousness of God in him" (2 Cor 5:21). May we who have known sin experience as well, through a spirit of reconciliation, God's own righteousness. We know that after such profound hurt, healing and reconciliation are beyond human capacity alone. It is God's grace and mercy that will lead us forward, trusting Christ's promise: "for God all things are possible" (Mt 19:26).

In working toward fulfilling this responsibility, we rely, first of all, on Almighty God to sustain us in faith and in the discernment of the right course to take.

We receive fraternal guidance and support from the Holy See that sustains us in this time of trial. In solidarity with Pope Francis, we express heartfelt love and sorrow for the victims of abuse.

We rely on the Catholic faithful of the United States. Nationally and in each diocese/eparchy, the wisdom and expertise of clergy, religious, and laity contribute immensely to confronting the effects of the crisis and taking steps to resolve it. We are filled with gratitude for their great faith, for their generosity, and for the spiritual and moral support that we receive from them.

We acknowledge and re-affirm the faithful service of the vast majority of our priests and deacons and the love that people have for them. They deservedly have our esteem and that of the Catholic people for their good work. It is regrettable that their committed ministerial witness has been overshadowed by this crisis.

In a special way, we acknowledge and thank victims of clergy sexual abuse and their families who have trusted us enough to share their stories and to help us understand more fully the consequences of this reprehensible violation of sacred trust. With Pope Francis, we praise the courage of those who speak out about their abuse; their actions are "a service of love, since for us it sheds light on a terrible darkness in the life of the Church." We pray that "the remnants of the darkness which touch them may be healed" (Address to Victims of Sexual Abuse, July 7, 2014).

5

Let there now be no doubt or confusion on anyone's part: For us, your bishops, our obligation to protect children and young people and to prevent sexual abuse flows from the mission and example given to us by Jesus Christ himself, in whose name we serve.

As we work to restore trust, we are reminded how Jesus showed constant care for the vulnerable. He inaugurated his ministry with these words of the Prophet Isaiah:

The Spirit of the Lord is upon me,
        because he has anointed me
                to bring glad tidings to the poor.
He has sent me to proclaim liberty to captives
        and recovery of sight to the blind,
                to let the oppressed go free,
and to proclaim a year acceptable to the Lord. (Lk 4:18-19)

In Matthew 25, the Lord, in his commission to his apostles and disciples, told them that whenever they show mercy and compassion to the least ones, they show it to him.

Jesus extended this care in a tender and urgent way to children, rebuking his disciples for keeping them away from him: "Let the children come to me" (Mt 19:14). And he uttered a grave warning that for anyone who would lead the little ones astray, it would be better for such a person "to have a great millstone hung around his neck and to be drowned in the depths of the sea" (Mt 18:6).

We hear these words of the Lord as prophetic for this moment. With a firm determination to restore the bonds of trust, we bishops recommit ourselves to a continual pastoral outreach to repair the breach with those who have suffered sexual abuse and with all the people of the Church.

In this spirit, over the last sixteen years, the principles and procedures of the *Charter* have been integrated into church life.

- The Secretariat of Child and Youth Protection provides the focus for a consistent, ongoing, and comprehensive approach to creating a safe environment for young people throughout the Church in the United States.

- The Secretariat also provides the means for us to be accountable for achieving the goals of the *Charter*, as demonstrated by its annual reports on the implementation of the *Charter* based on independent compliance audits.

- The National Review Board is carrying on its responsibility to assist in the assessment of diocesan/eparchial compliance with the *Charter for the Protection of Children and Young People.*

- The descriptive study of the nature and scope of sexual abuse of minors by Catholic clergy in the United States, commissioned by the National Review Board, was completed in February 2004. The resulting study, examining the historical period 1950-2002, by the John Jay College of Criminal Justice provides us with a powerful tool not only to examine our past but also to secure our future against such misconduct.

- The U.S. bishops charged the National Review Board to oversee the completion of the *Causes and Context* study. The Study, which calls for ongoing education, situational prevention, and oversight and accountability, was completed in 2011.

- Victims' assistance coordinators are in place throughout our nation to assist dioceses and eparchies in responding to the pastoral needs of the abused.

- Diocesan/eparchial bishops in every diocese/eparchy are advised and greatly assisted by diocesan and eparchial review boards as the bishops make the decisions needed to fulfill the *Charter*.

7

- Safe environment programs are in place to assist parents and children—and those who work with children—in preventing harm to young people. These programs continually seek to incorporate the most useful developments in the field of child protection.

Through these steps and many others, we remain committed to the safety of our children and young people.

While the number of reported cases of sexual abuse has decreased over the last sixteen years, the harmful effects of this abuse continue to be experienced both by victims and dioceses/eparchies.

Thus it is with a vivid sense of the effort which is still needed to confront the effects of this crisis fully and with the wisdom gained by the experience of the last sixteen years that we have reviewed and revised the *Charter for the Protection of Children and Young People*. We now re-affirm that we will assist in the healing of those who have been injured, will do all in our power to protect children and young people, and will work with our clergy, religious, and laity to restore trust and harmony in our faith communities, as we pray for the Kingdom of God to come, here on earth, as it is in heaven.

To make effective our goals of a safe environment within the Church for children and young people and of preventing sexual abuse of minors by clergy in the future, we, the members of the United States Conference of Catholic Bishops, have outlined in this *Charter* a series of practical and pastoral steps, and we commit ourselves to taking them in our dioceses and eparchies.

## To Promote Healing and Reconciliation with Victims/Survivors of Sexual Abuse of Minors

**ARTICLE 1.** Dioceses/eparchies are to reach out to victims/survivors and their families and demonstrate a sincere commitment to their spiritual and emotional well-being. The first obligation of the Church with regard to the victims is for healing and reconciliation. Each

diocese/eparchy is to continue its outreach to every person who has been the victim of sexual abuse as a minor by anyone in church service, whether the abuse was recent or occurred many years in the past. This outreach may include provision of counseling, spiritual assistance, support groups, and other social services agreed upon by the victim and the diocese/eparchy.

Through pastoral outreach to victims and their families, the diocesan/eparchial bishop or his representative is to offer to meet with them, to listen with patience and compassion to their experiences and concerns, and to share the "profound sense of solidarity and concern" expressed by St. John Paul II, in his Address to the Cardinals of the United States and Conference Officers (April 23, 2002). Pope Benedict XVI, too, in his address to the U.S. bishops in 2008 said of the clergy sexual abuse crisis, "It is your God-given responsibility as pastors to bind up the wounds caused by every breach of trust, to foster healing, to promote reconciliation and to reach out with loving concern to those so seriously wronged."

We bishops and eparchs commit ourselves to work as one with our brother priests and deacons to foster reconciliation among all people in our dioceses/eparchies. We especially commit ourselves to work with those individuals who were themselves abused and the communities that have suffered because of the sexual abuse of minors that occurred in their midst.

**ARTICLE 2.** Dioceses/eparchies are to have policies and procedures in place to respond promptly to any allegation where there is reason to believe that sexual abuse of a minor has occurred. Dioceses/eparchies are to have a competent person or persons to coordinate assistance for the immediate pastoral care of persons who report having been sexually abused as minors by clergy or other church personnel. The procedures for those making a complaint are to be readily available in printed form and other media in the principal languages in which the liturgy is celebrated in the diocese/eparchy and be the subject of public announcements at least annually.

Dioceses/eparchies are also to have a review board that functions as a confidential consultative body to the bishop/eparch. The majority of its members are to be lay persons not in the employ of the diocese/eparchy (see Norm 5 in *Essential Norms for Diocesan/Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons*, 2006). This board is to advise

9

the diocesan/eparchial bishop in his assessment of allegations of sexual abuse of minors and in his determination of a cleric's suitability for ministry. It is regularly to review diocesan/eparchial policies and procedures for dealing with sexual abuse of minors. Also, the board can review these matters both retrospectively and prospectively and give advice on all aspects of responses in connection with these cases.

**ARTICLE 3.** Dioceses/eparchies are not to enter into settlements which bind the parties to confidentiality, unless the victim/survivor requests confidentiality and this request is noted in the text of the agreement.

## To Guarantee an Effective Response to Allegations of Sexual Abuse of Minors

**ARTICLE 4.** Dioceses/eparchies are to report an allegation of sexual abuse of a person who is a minor to the public authorities with due regard for the seal of the Sacrament of Penance. Diocesan/eparchial personnel are to comply with all applicable civil laws with respect to the reporting of allegations of sexual abuse of minors to civil authorities and cooperate in their investigation in accord with the law of the jurisdiction in question.

Dioceses/eparchies are to cooperate with public authorities about reporting cases even when the person is no longer a minor.

In every instance, dioceses/eparchies are to advise victims of their right to make a report to public authorities and support this right.

**ARTICLE 5.** We affirm the words of St. John Paul II, in his Address to the Cardinals of the United States and Conference Officers: "There is no place in the priesthood or religious life for those who would harm the young." Pope Francis has consistently reiterated this with victims of clergy sexual abuse.

Sexual abuse of a minor by a cleric is a crime in the universal law of the Church (CIC, c. 1395 §2; CCEO, c. 1453 §1). Because of the seriousness of this matter, jurisdiction has been reserved to the Congregation for the Doctrine of the Faith (*Motu proprio Sacramentorum sanctitatis tutela*, AAS 93, 2001). Sexual abuse of a minor is also a crime in all civil jurisdictions in the United States.

Diocesan/eparchial policy is to provide that for even a single act of sexual abuse of a minor—whenever it occurred—which is admitted or established after an appropriate process in accord with canon law, the offending priest or deacon is to be permanently removed from ministry and, if warranted, dismissed from the clerical state. In keeping with the stated purpose of this *Charter*, an offending priest or deacon is to be offered therapeutic professional assistance both for the purpose of prevention and also for his own healing and well-being.

The diocesan/eparchial bishop is to exercise his power of governance, within the parameters of the universal law of the Church, to ensure that any priest or deacon subject to his governance who has committed even one act of sexual abuse of a minor as described below (see notes) shall not continue in ministry.

A priest or deacon who is accused of sexual abuse of a minor is to be accorded the presumption of innocence during the investigation of the allegation and all appropriate steps are to be taken to protect his reputation. He is to be encouraged to retain the assistance of civil and canonical counsel. If the allegation is deemed not substantiated, every step possible is to be taken to restore his good name, should it have been harmed.

In fulfilling this article, dioceses/eparchies are to follow the requirements of the universal law of the Church and of the *Essential Norms* approved for the United States.

**ARTICLE 6.** There are to be clear and well publicized diocesan/eparchial standards of ministerial behavior and appropriate boundaries for clergy and for any other paid personnel and volunteers of the Church with regard to their contact with minors.

**ARTICLE 7.** Dioceses/eparchies are to be open and transparent in communicating with the public about sexual abuse of minors by clergy within the confines of respect for the privacy and the reputation of the individuals involved. This is especially so with regard to informing parish and other church communities directly affected by sexual abuse of a minor.

## To Ensure the Accountability of Our Procedures

**ARTICLE 8.** The Committee on the Protection of Children and Young People is a standing committee of the United States Conference of Catholic Bishops. Its membership is to include representation from all the episcopal regions of the country, with new appointments staggered to maintain continuity in the effort to protect children and youth.

The Committee is to advise the USCCB on all matters related to child and youth protection and is to oversee the development of the plans, programs, and budget of the Secretariat of Child and Youth Protection. It is to provide the USCCB with comprehensive planning and recommendations concerning child and youth protection by coordinating the efforts of the Secretariat and the National Review Board.

**ARTICLE 9.** The Secretariat of Child and Youth Protection, established by the Conference of Catholic Bishops, is to staff the Committee on the Protection of Children and Young People and be a resource for dioceses/eparchies for the implementation of "safe environment" programs and for suggested training and development of diocesan personnel responsible for child and youth protection programs, taking into account the financial and other resources, as well as the population, area, and demographics of the diocese/eparchy.

The Secretariat is to produce an annual public report on the progress made in implementing and maintaining the standards in this *Charter*. The report is to be based on an annual audit process whose method, scope, and cost are to be approved by the Administrative Committee on the recommendation of the Committee on the Protection of Children and Young People. This public report is to include the names of those dioceses/eparchies which the audit shows are not in compliance with the provisions and expectations of the *Charter*. The audit method refers to the

12

process and techniques used to determine compliance with the *Charter*. The audit scope relates to the focus, parameters, and time period for the matters to be examined during an individual audit.

As a member of the Conference staff, the Executive Director of the Secretariat is appointed by and reports to the General Secretary. The Executive Director is to provide the Committee on the Protection of Children and Young People and the National Review Board with regular reports of the Secretariat's activities.

**ARTICLE 10.** The whole Church, at both the diocesan/eparchial and national levels, must be engaged in maintaining safe environments in the Church for children and young people.

The Committee on the Protection of Children and Young People is to be assisted by the National Review Board, a consultative body established in 2002 by the USCCB. The Board will review the annual report of the Secretariat of Child and Youth Protection on the implementation of this *Charter* in each diocese/eparchy and any recommendations that emerge from it, and offer its own assessment regarding its approval and publication to the Conference President.

The Board will also advise the Conference President on future members. The Board members are appointed by the Conference President in consultation with the Administrative Committee and are accountable to him and to the USCCB Executive Committee. Before a candidate is contacted, the Conference President is to seek and obtain, in writing, the endorsement of the candidate's diocesan bishop. The Board is to operate in accord with the statutes and bylaws of the USCCB and within procedural guidelines developed by the Board in consultation with the Committee on the Protection of Children and Young People and approved by the USCCB Administrative Committee. These guidelines set forth such matters as the Board's purpose and responsibility, officers, terms of office, and frequency of reports to the Conference President on its activities.

The Board will offer its advice as it collaborates with the Committee on the Protection of Children and Young People on matters of child and youth protection, specifically on policies and best practices. For example, the Board will continue to monitor the recommendations derived

13

from the *Causes and Context* study. The Board and Committee on the Protection of Children and Young People will meet jointly every year.

The Board will review the work of the Secretariat of Child and Youth Protection and make recommendations to the Executive Director. It will assist the Executive Director in the development of resources for dioceses.

**ARTICLE 11.** The President of the Conference is to inform the Holy See of this revised *Charter* to indicate the manner in which we, the Catholic bishops, together with the entire Church in the United States, intend to continue our commitment to the protection of children and young people. The President is also to share with the Holy See the annual reports on the implementation of the *Charter*.

# To Protect the Faithful in
# the Future

**ARTICLE 12.** Dioceses/eparchies are to maintain "safe environment" programs which the diocesan/eparchial bishop deems to be in accord with Catholic moral principles. They are to be conducted cooperatively with parents, civil authorities, educators, and community organizations to provide education and training for minors, parents, ministers, employees, volunteers, and others about ways to sustain and foster a safe environment for minors. Dioceses/eparchies are to make clear to clergy and all members of the community the standards of conduct for clergy and other persons with regard to their contact with minors.

**ARTICLE 13.** The diocesan/eparchial bishop is to evaluate the background of all incardinated priests and deacons. When a priest or deacon, not incardinated in the diocese/eparchy, is to engage in ministry in the diocese/eparchy, regardless of the length of time, the evaluation of his background may be satisfied through a written attestation of suitability for ministry supplied by his proper ordinary/major superior to the diocese/eparchy. Dioceses/eparchies are to evaluate the background of all their respective diocesan/eparchial and parish/school or other paid personnel

and volunteers whose duties include contact with minors. Specifically, they are to utilize the resources of law enforcement and other community agencies. Each diocese/eparchy is to determine the application/renewal of background checks according to local practice. In addition, they are to employ adequate screening and evaluative techniques in deciding the fitness of candidates for ordination (see USCCB, *Program of Priestly Formation* [Fifth Edition], 2006, no. 39 and the *National Directory for the Formation, Ministry and Life of Permanent Deacons in the United States,* n.178 j).[2]

**ARTICLE 14.** Transfers of all priests and deacons who have committed an act of sexual abuse against a minor for residence, including retirement, shall be in accord with Norm 12 of the Essential Norms (see *Proposed Guidelines on the Transfer or Assignment of Clergy and Religious,* adopted by the USCCB, the Conference of Major Superiors of Men [CMSM], the Leadership Conference of Women Religious [LCWR], and the Council of Major Superiors of Women Religious [CMSWR] in 1993).

**ARTICLE 15.** To ensure continuing collaboration and mutuality of effort in the protection of children and young people on the part of the bishops and religious ordinaries, two representatives of the Conference of Major Superiors of Men are to serve as consultants to the Committee on the Protection of Children and Young People. At the invitation of the Major Superiors, the Committee will designate two of its members to consult with its counterpart at CMSM. Diocesan/eparchial bishops and major superiors of clerical institutes or their delegates are to meet periodically to coordinate their roles concerning the issue of allegations made against a cleric member of a religious institute ministering in a diocese/eparchy.

**ARTICLE 16.** Given the extent of the problem of the sexual abuse of minors in our society, we are willing to cooperate with other churches and ecclesial communities, other religious bodies, institutions of learning, and other interested organizations in conducting research in this area.

**ARTICLE 17.** We commit ourselves to work individually in our dioceses/eparchies and together as a Conference, through the appropriate committees, to strengthen our programs both for initial priestly and diaconal formation and their ongoing formation. With renewed urgency, we will

promote programs of human formation for chastity and celibacy for both seminarians and priests based upon the criteria found in *Pastores dabo vobis, no. 50*, the *Program of Priestly Formation*, and the *Basic Plan for the Ongoing Formation of Priests*, as well as similar, appropriate programs for deacons based upon the criteria found in the *National Directory for the Formation, Ministry and Life of Permanent Deacons in the United States*. We will continue to assist priests, deacons, and seminarians in living out their vocation in faithful and integral ways.

# Conclusion

As we wrote in 2002, "It is within this context of the essential soundness of the priesthood and of the deep faith of our brothers and sisters in the Church that we know that we can meet and resolve this crisis for now and the future."

We reaffirm that the vast majority of priests and deacons serve their people faithfully and that they have their esteem and affection. They also have our respect and support and our commitment to their good names and well-being.

An essential means of dealing with the crisis is prayer for healing and reconciliation, and acts of reparation for the grave offense to God and the deep wound inflicted upon his holy people. Closely connected to prayer and acts of reparation is the call to holiness of life and the care of the diocesan/eparchial bishop to ensure that he and his priests and deacons avail themselves of the proven ways of avoiding sin and growing in holiness of life.

It is with reliance on the grace of God and in a spirit of prayer and penance that we renew the pledges which we made in the 2002 *Charter*:

**We pledge most solemnly to one another and to you, God's people, that we will work to our utmost for the protection of children and youth.**

**We pledge that we will devote to this goal the resources and personnel necessary to accomplish it.**

**We pledge that we will do our best to ordain to the diaconate and priesthood and put into positions of trust only those who share this commitment to protecting children and youth.**

**We pledge that we will work toward healing and reconciliation for those sexually abused by clerics.**

Much has been done to honor these pledges. We devoutly pray that God who has begun this good work in us will bring it to fulfillment.

This *Charter* is published for the dioceses/eparchies of the United States. It is to be reviewed again after seven years by the Committee on the Protection of Children and Young People with the advice of the National Review Board. The results of this review are to be presented to the full Conference of Bishops for confirmation. Authoritative interpretations of its provisions are reserved to the Conference of Bishops.

NOTES

1   For purposes of this *Charter,* the offense of sexual abuse of a minor will be understood in accord with the provisions of *Sacramentorum sanctitatis tutela* (SST), article 6, which reads:

> §1. The more grave delicts against morals which are reserved to the Congregation for the Doctrine of the Faith are:
>> 1° the delict against the sixth commandment of the Decalogue committed by a cleric with a minor below the age of eighteen years; in this case, a person who habitually lacks the use of reason is to be considered equivalent to a minor.
>> 2° the acquisition, possession, or distribution by a cleric of pornographic images of minors under the age of fourteen, for purposes of sexual gratification, by whatever means or using whatever technology;
> §2. A cleric who commits the delicts mentioned above in §1 is to be punished according to the gravity of his crime, not excluding dismissal or deposition.

In view of the Circular Letter from the Congregation for the Doctrine of the Faith, dated May 3, 2011, which calls for "mak[ing] allowance for the legislation of the country where the Conference is located," Section III(g), we will apply the federal legal age for defining child pornography, which includes pornographic images of minors under the age of eighteen, for assessing a cleric's suitability for ministry and for complying with civil reporting statutes.

If there is any doubt whether a specific act qualifies as an external, objectively grave violation, the writings of recognized moral theologians should be consulted, and the opinions of recognized experts should be appropriately obtained (*Canonical Delicts Involving Sexual Misconduct and Dismissal from the Clerical State*, 1995, p. 6). Ultimately, it is the responsibility of the diocesan bishop/eparch, with the advice of a qualified review board, to determine the gravity of the alleged act.

2 In 2009, after consultation with members of the USCCB Committee on the Protection of Children and Young People and the Conference of Major Superiors of Men and approval from the USCCB Committee on Canonical Affairs and Church Governance, additional Model Letters of Suitability, now available on the USCCB website, were agreed upon and published for use by bishops and major superiors in situations which involve both temporary and extended ministry for clerics.

# Essential Norms for Diocesan/ Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons

*Office of the President*
3211 FOURTH STREET NE • WASHINGTON DC 20017-1194
202-541-3100 • FAX 202-541-3166

Most Reverend William S. Skylstad, D.D.
Bishop of Spokane

May 5, 2006
THE UNITED STATES CONFERENCE OF CATHOLIC BISHOPS

## DECREE OF PROMULGATION

On November 13, 2002, the members of the United States Conference of Catholic Bishops approved as particular law the *Essential Norms for Diocesan/Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons*. Following the grant of the required *recognitio* by the Congregation for Bishops on December 8, 2002, the *Essential Norms* were promulgated by the President of the same Conference on December 12, 2002.

Thereafter, on June 17, 2005, the members of the United States Conference of Catholic Bishops approved a revised text of the *Essential Norms*. By a decree dated January 1, 2006, and signed by His Eminence, Giovanni Battista Cardinal Re, Prefect of the Congregation for Bishops, and His Excellency, the Most Reverend Francesco Monterisi, Secretary of the same Congregation, the

19

*recognitio* originally granted to the *Essential Norms* of 2002 was extended to the revised version *donec aliter provideatur*.

As President of the United States Conference of Catholic Bishops, I therefore decree the promulgation of the *Essential Norms* of June 17, 2005. These *Norms* shall obtain force on May 15, 2006, and so shall from that day bind as particular law all Dioceses and Eparchies of the United States Conference of Catholic Bishops.

Most Reverend William S. Skylstad
Bishop of Spokane
President, USCCB

Reverend Monsignor David J. Malloy
General Secretary

# Preamble

On June 14, 2002, the United States Conference of Catholic Bishops approved a Charter for the Protection of Children and Young People. The charter addresses the Church's commitment to deal appropriately and effectively with cases of sexual abuse of minors by priests, deacons, and other church personnel (i.e., employees and volunteers). The bishops of the United States have promised to reach out to those who have been sexually abused as minors by anyone serving the Church in ministry, employment, or a volunteer position, whether the sexual abuse was recent or occurred many years ago. They stated that they would be as open as possible with the people in parishes and communities about instances of sexual abuse of minors, with respect always for the privacy and the reputation of the individuals involved. They have committed themselves to the pastoral and spiritual care and emotional well-being of those who have been sexually abused and of their families.

In addition, the bishops will work with parents, civil authorities, educators, and various organizations in the community to make and maintain the safest environment for minors. In the same way, the bishops have pledged to evaluate the background of seminary applicants as well as all church personnel who have responsibility for the care and supervision of children and young people.

Therefore, to ensure that each diocese/eparchy in the United States of America will have procedures in place to respond promptly to all allegations of sexual abuse of minors, the United States Conference of Catholic Bishops decrees these norms for diocesan/eparchial policies dealing with allegations of sexual abuse of minors by diocesan and religious priests or deacons.[1] These norms are complementary to the universal law of the Church and are to be interpreted in accordance with that law. The Church has traditionally considered the sexual abuse of minors a grave delict and punishes the offender with penalties, not excluding dismissal from the clerical state if the case so warrants.

For purposes of these Norms, sexual abuse shall include any offense by a cleric against the Sixth Commandment of the Decalogue with a minor as understood in CIC, canon 1395 §2, and CCEO, canon 1453 §1 (*Sacramentorum sanctitatis tutela*, article 6 §1).[2]

# Norms

1. These Essential Norms have been granted *recognitio* by the Holy See. Having been legitimately promulgated in accordance with the practice of the United States Conference of Catholic Bishops on May 5, 2006, they constitute particular law for all the dioceses/eparchies of the United States of America.[3]

2. Each diocese/eparchy will have a written policy on the sexual abuse of minors by priests and deacons, as well as by other church personnel. This policy is to comply fully with, and is to specify in more detail, the steps to be taken in implementing the requirements of canon law, particularly CIC, canons 1717-1719, and CCEO, canons 1468-1470. A copy of this policy will be filed with the United States Conference of Catholic Bishops within three months of the effective date of these norms. Copies of any eventual revisions of the written diocesan/eparchial policy are also to be filed with the United States Conference of Catholic Bishops within three months of such modifications.

3. Each diocese/eparchy will designate a competent person to coordinate assistance for the immediate pastoral care of persons who claim to have been sexually abused when they were minors by priests or deacons.

4. To assist diocesan/eparchial bishops, each diocese/eparchy will also have a review board which will function as a confidential consultative body to the bishop/eparch in discharging his responsibilities. The functions of this board may include

    **a.**    advising the diocesan bishop/eparch in his assessment of allegations of sexual abuse of minors and in his determination of suitability for ministry;

    **b.**    reviewing diocesan/eparchial policies for dealing with sexual abuse of minors; and

    **c.**     offering advice on all aspects of these cases, whether retrospectively or prospectively.

**5.** The review board, established by the diocesan/eparchial bishop, will be composed of at least five persons of outstanding integrity and good judgment in full communion with the Church. The majority of the review board members will be lay persons who are not in the employ of the diocese/eparchy; but at least one member should be a priest who is an experienced and respected pastor of the diocese/eparchy in question, and at least one member should have particular expertise in the treatment of the sexual abuse of minors. The members will be appointed for a term of five years, which can be renewed. It is desirable that the Promoter of Justice participate in the meetings of the review board.

**6.** When an allegation of sexual abuse of a minor by a priest or deacon is received, a preliminary investigation in accordance with canon law will be initiated and conducted promptly and objectively (CIC, c. 1717; CCEO, c. 1468). During the investigation the accused enjoys the presumption of innocence, and all appropriate steps shall be taken to protect his reputation. The accused will be encouraged to retain the assistance of civil and canonical counsel and will be promptly notified of the results of the investigation. When there is sufficient evidence that sexual abuse of a minor has occurred, the Congregation of the Doctrine of the Faith shall be notified. The bishop/eparch shall then apply the precautionary measures mentioned in CIC, canon 1722, or CCEO, canon 1473—i.e., withdraw the accused from exercising the sacred ministry or any ecclesiastical office or function, impose or prohibit residence in a given place or territory, and prohibit public participation in the Most Holy Eucharist pending the outcome of the process.[4]

**7.** The alleged offender may be requested to seek, and may be urged voluntarily to comply with, an appropriate medical and psychological evaluation at a facility mutually acceptable to the diocese/eparchy and to the accused.

**8.** When even a single act of sexual abuse by a priest or deacon is admitted or is established after an appropriate process in accord with canon law, the offending priest or deacon will be removed

permanently from ecclesiastical ministry, not excluding dismissal from the clerical state, if the case so warrants (SST, Art. 6; CIC, c. 1395 §2; CCEO, c. 1453 §1). [5]

a. In every case involving canonical penalties, the processes provided for in canon law must be observed, and the various provisions of canon law must be considered (cf. *Canonical Delicts Involving Sexual Misconduct and Dismissal from the Clerical State*, 1995; Letter from the Congregation for the Doctrine of the Faith, May 18, 2001). Unless the Congregation for the Doctrine of the Faith, having been notified, calls the case to itself because of special circumstances, it will direct the diocesan bishop/eparch to proceed (Article 13, "Procedural Norms" for *Motu proprio Sacramentorum sanctitatis tutela*, AAS, 93, 2001, p. 787). If the case would otherwise be barred by prescription, because sexual abuse of a minor is a grave offense, the bishop/eparch may apply to the Congregation for the Doctrine of the Faith for a derogation from the prescription, while indicating relevant grave reasons. For the sake of canonical due process, the accused is to be encouraged to retain the assistance of civil and canonical counsel. When necessary, the diocese/eparchy will supply canonical counsel to a priest. The provisions of CIC, canon 1722, or CCEO, canon 1473, shall be implemented during the pendency of the penal process.

b. If the penalty of dismissal from the clerical state has not been applied (e.g., for reasons of advanced age or infirmity), the offender ought to lead a life of prayer and penance. He will not be permitted to celebrate Mass publicly or to administer the sacraments. He is to be instructed not to wear clerical garb, or to present himself publicly as a priest.

**9.** At all times, the diocesan bishop/eparch has the executive power of governance, within the parameters of the universal law of the Church, through an administrative act, to remove an offending cleric from office, to remove or restrict his faculties, and to limit his exercise of priestly ministry.[6] Because sexual abuse of a minor by a cleric is a crime in the universal law of the Church (CIC, c. 1395 §2; CCEO, c. 1453 §1) and is a crime in all civil jurisdictions in the United States, for the sake of the common good and observing the provisions of canon law, the

diocesan bishop/eparch shall exercise this power of governance to ensure that any priest or deacon who has committed even one act of sexual abuse of a minor as described above shall not continue in active ministry.[7]

**10.** The priest or deacon may at any time request a dispensation from the obligations of the clerical state. In exceptional cases, the bishop/eparch may request of the Holy Father the dismissal of the priest or deacon from the clerical state *ex officio*, even without the consent of the priest or deacon.

**11.** The diocese/eparchy will comply with all applicable civil laws with respect to the reporting of allegations of sexual abuse of minors to civil authorities and will cooperate in their investigation. In every instance, the diocese/eparchy will advise and support a person's right to make a report to public authorities.[8]

**12.** No priest or deacon who has committed an act of sexual abuse of a minor may be transferred for a ministerial assignment in another diocese/eparchy. Every bishop/eparch who receives a priest or deacon from outside his jurisdiction will obtain the necessary information regarding any past act of sexual abuse of a minor by the priest or deacon in question.

Before such a diocesan/eparchial priest or deacon can be transferred for residence to another diocese/eparchy, his diocesan/eparchial bishop shall forward, in a confidential manner, to the bishop of the proposed place of residence any and all information concerning any act of sexual abuse of a minor and any other information indicating that he has been or may be a danger to children or young people.

In the case of the assignment for residence of such a clerical member of an institute or a society into a local community within a diocese/eparchy, the major superior shall inform the diocesan/eparchial bishop and share with him in a manner respecting the limitations of confidentiality found in canon and civil law all information concerning any act of sexual abuse of a minor and any other information indicating that he has been or may be a danger to children or young people so that the bishop/eparch can make an informed judgment that suitable

safeguards are in place for the protection of children and young people. This will be done with due recognition of the legitimate authority of the bishop/eparch; of the provisions of CIC, canon 678 (CCEO, canons 415 §1 and 554 §2), and of CIC, canon 679; and of the autonomy of the religious life (CIC, c. 586).

**13.** Care will always be taken to protect the rights of all parties involved, particularly those of the person claiming to have been sexually abused and of the person against whom the charge has been made. When an accusation has been shown to be unfounded, every step possible will be taken to restore the good name of the person falsely accused.

NOTES

1     These Norms constitute particular law for the dioceses, eparchies, clerical religious institutes, and societies of apostolic life of the United States with respect to all priests and deacons in the ecclesiastical ministry of the Church in the United States. When a major superior of a clerical religious institute or society of apostolic life applies and interprets them for the internal life and governance of the institute or society, he has the obligation to do so according to the universal law of the Church and the proper law of the institute or society.

2     If there is any doubt whether a specific act qualifies as an external, objectively grave violation, the writings of recognized moral theologians should be consulted, and the opinions of recognized experts should be appropriately obtained (*Canonical Delicts*, p. 6). Ultimately, it is the responsibility of the diocesan bishop/eparch, with the advice of a qualified review board, to determine the gravity of the alleged act.

3     Due regard must be given to the proper legislative authority of each Eastern Catholic Church.

4     Article 19 *Sacramentorum sanctitatis tutela states*, "With due regard for the right of the Ordinary to impose from the outset of the preliminary investigation those measures which are established in can. 1722 of the Code of Canon Law, or in can. 1473 of the Code of Canons of the Eastern Churches, the respective presiding judge may, at the request of the Promoter of Justice, exercise the same power under the same conditions determined in the canons themselves."

5     Removal from ministry is required whether or not the cleric is diagnosed by qualified experts as a pedophile or as suffering from a related sexual disorder that requires professional treatment. With regard to the use of the phrase "ecclesiastical ministry," by clerical members of institutes of consecrated life and societies of apostolic life, the provisions of canons 678 and 738 also apply, with due regard for canons 586 and 732.

6     Cf. CIC, cc. 35-58, 149, 157, 187-189, 192-195, 277 §3, 381 §1, 383, 391, 1348, and 1740-1747. Cf. also CCEO, cc. 1510 §1 and 2, 1°-2°, 1511, 1512 §§1-2, 1513 §§2-3 and 5, 1514-1516, 1517 §1, 1518, 1519 §2, 1520 §§1-3, 1521, 1522 §1, 1523-1526, 940, 946, 967-971, 974-977, 374, 178, 192 §§1-3, 193 §2, 191, and 1389-1396.

7     The diocesan bishop/eparch may exercise his executive power of governance to take one or more of the following administrative actions (CIC, cc. 381, 129ff.; CCEO, cc. 178, 979ff.):

    a.    He may request that the accused freely resign from any currently held ecclesiastical office (CIC, cc. 187-189; CCEO, cc. 967-971).

    b.    Should the accused decline to resign and should the diocesan bishop/eparch judge the accused to be truly not suitable (CIC, c. 149 §1; CCEO, c. 940) at this time for holding an office previously freely conferred (CIC, c. 157), then he may remove that person from office observing the required canonical procedures (CIC, cc. 192-195, 1740-1747; CCEO, cc. 974-977, 1389-1396).

    c.    For a cleric who holds no office in the diocese/eparchy, any previously delegated faculties may be administratively removed (CIC, cc. 391 §1 and 142 §1; CCEO, cc. 191 §1 and 992 §1), while any *de iure* faculties may be removed or restricted by the competent authority as provided in law (e.g., CIC, c. 764; CCEO, c. 610 §§2-3).

    d.    The diocesan bishop/eparch may also determine that circumstances surrounding a particular case constitute the just and reasonable cause for a priest to celebrate the Eucharist with no member of the faithful present (CIC, c. 906). The bishop may forbid the priest to celebrate the Eucharist publicly and to administer the sacraments, for the good of the Church and for his own good.

    e.    Depending on the gravity of the case, the diocesan bishop/eparch may also dispense (CIC, cc. 85-88; CCEO, cc. 1536 §1–1538) the cleric from the obligation

of wearing clerical attire (CIC, c. 284; CCEO, c. 387) and may urge that he not do so, for the good of the Church and for his own good.

These administrative actions shall be taken in writing and by means of decrees (CIC, cc. 47-58; CCEO, cc. 1510 §2, 1°-2°, 1511, 1513 §§2-3 and 5, 1514, 1517 §1, 1518, 1519 §2, 1520) so that the cleric affected is afforded the opportunity of recourse against them in accord with canon law (CIC, cc. 1734ff.; CCEO, cc. 999ff.).

8      The necessary observance of the canonical norms internal to the Church is not intended in any way to hinder the course of any civil action that may be operative. At the same time, the Church reaffirms her right to enact legislation binding on all her members concerning the ecclesiastical dimensions of the delict of sexual abuse of minors.

# A Statement of Episcopal Commitment

We bishops pledge again to respond to the demands of the *Charter* in a way that manifests our accountability to God, to God's people, and to one another. Individually and together, we acknowledge mistakes in the past when some bishops transferred, from one assignment to another, priests who abused minors. We recognize our roles in the suffering this has caused, and we continue to ask forgiveness for it.

Without at all diminishing the importance of broader accountability, this statement focuses on the accountability which flows from our episcopal communion and fraternal solidarity, a moral responsibility we have with and for each other.

While bishops are ordained primarily for their diocese or eparchy, we are called as well to protect the unity and to promote the common discipline of the whole Church (CIC, c. 392; CCEO, c. 201). Participating in the college of bishops, each bishop is responsible to act in a manner that reflects both effective and affective collegiality.

Respecting the legitimate rights of bishops who are directly accountable to the Holy See, in a spirit of collegiality and fraternity we renew our commitment to the following:

1. Within each of our provinces, we will assist each other to interpret correctly and implement the *Charter for the Protection of Children and Young People*, always respecting Church law and striving to reflect the Gospel.

2. We will apply the requirements of the *Charter* also to ourselves, respecting always Church law as it applies to bishops. Therefore, if a bishop is accused of the sexual abuse of a minor, the accused bishop is obliged to inform the Apostolic Nuncio. If another bishop becomes aware of the sexual abuse of a minor by another bishop or of an allegation of the sexual abuse of a minor by a bishop, he too is obliged to inform the Apostolic Nuncio and comply with applicable civil laws.

3. In cases of financial demands for settlements involving allegations of any sexual misconduct by a bishop, he, or any of us who become aware of it, is obliged to inform the Apostolic Nuncio.

4. Within each of our provinces, as an expression of collegiality, including fraternal support, fraternal challenge and fraternal correction, we will engage in ongoing mutual reflection upon our commitment to holiness of life and upon the exercise of our episcopal ministry.

In making this statement, we firmly uphold the dignity of every human being and renew our commitment to live and promote the chastity required of all followers of Christ and especially of deacons, priests and bishops.

This Statement of Episcopal Commitment will be reviewed by the Committee on Clergy, Consecrated Life and Vocations upon the next review of the *Charter*.





## Archbishop Gregory Aymond

- Home
- About
- Photos
- Videos
- Posts
- Events
- Community
- Info and Ads

Create a Page

 Like   Follow   Share

**Archbishop Gregory Aymond**
June 22 ·

**June 22, 2018**

To Fr. Jonathan Hemelt, Pastor and parishioners of Our Lady of the Rosary and the people of God in our Archdiocese

Dear Sisters and Brothers in Christ:

This communication is to discuss with you allegations of sexual abuse by George Brignac. Mr. Brignac served at Our Lady of the Rosary after his diaconate ordination as a deacon from 1976 until 1988. The recent report relates to an allegation that occurred during this time period almost 40 years ago but reported to the Archdiocese of New Orleans four months ago.

It is noted that there were other allegations and criminal charges brought against Mr. Brignac in the past, of which he was acquitted or charges refused by the District Attorney's Office at that time. Archbishop Hannan publicly removed him from ministry in 1988. According to our records and files he worked as a teacher at St. Francis Cabrini School, St. John Vianney Prep, and St. Matthew the Apostle all in the Archdiocese of New Orleans prior to his ordination. He served as a deacon and teacher at Our Lady of the Rosary from 1976 to 1988 and for a time at Cabrini High School until he was removed from ministry. He had no other assignments. Since 1988 he has not served as a deacon in a parish, school, or any ministry of the Archdiocese of New Orleans.

Our policy in regards to the Protection of Children and Young People is online and outlines the steps and processes taken when an allegation is received and is in alignment with the US Catholic Bishops Charter for the Protection of Children and Young People. Upon receiving the lawsuit detailing the allegations, we acted quickly and pastorally according to these policies and practices. No one should suffer abuse and especially not by a church leader.

I am firmly committed to healing for victims of abuse. I have met with abuse victims and will always make the offer to meet with those who come forward with allegations of abuse. I am also committed to continuing to be transparent in the handling of allegations of abuse. I pray daily for those who have suffered abuse, especially those affected by clergy.

If anyone has any information regarding abuse by a member of the clergy or anyone serving in the Archdiocese of New Orleans, I encourage you to come forward and report this. We take allegations seriously and investigate them thoroughly. We, and I personally, are committed to making our parishes, schools, and ministries a safe place for all, especially the young church. We desire to provide real opportunities for healing for those hurt by the Catholic Church. I extend my pastoral care and compassion to Fr. Hemelt and parishioners of Our Lady of the Rosary,

### Community
See All
- Invite your friends to like this Page
- 9,242 people like this
- 9,285 people follow this

### About
See All
- NOLACatholic.org
- Public Figure
- Suggest Edits

### Related Pages
 **St. Louis Cathedral - ...** Religious Organization   Like

 **Saint Joseph Abbey** Religious Organization   Like

 **St Catherine of Siena** Religious Organization   Like

See More

### Pages Liked by This Page
English (US) · Español · Português (Brasil) · Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices · Cookies · More
Facebook © 2018

Chat (Off)


EXHIBIT 10



To all who have been abused, I pray that you know the healing of Christ. I lift you to the Lord that you may know God's peace.

Wishing you God's blessings, I am

Sincerely in Christ,

Most Reverend Gregory M. Aymond
Archbishop of New Orleans

78                                    12 Comments  14 Shares

        Like                 Comment              Share

**Archbishop Gregory Aymond**

Oldest

Home

About

Photos

Videos

Posts

Events

Community

Info and Ads

**Menu**        Set Weather        Subscribe

Search

<u>LATITUDE</u>

# Catholic church should open its records because evil hates the light

Updated Sep 23, 2018;
Posted Sep 23, 2018



New Orleans Archbishop Gregory Aymond says the Catholic bishops in Louisiana are discussing whether to open the records on priests credibly accused of sexual child abuse. (Photo by P. Forest, NOLA.com | The Times-Picayune)



145



EXHIBIT

11

45                   shares

**By Tim Morris, Columnist,** tmorris@nola.com
NOLA.com | The Times-Picayune

In the almost six weeks since a Pennsylvania grand jury released findings that 300 Catholic priests had committed unspeakable crimes of sexual abuse against more than 1,000 children over seven decades, New Orleans Archbishop Gregory Aymond says the "heart-wrenching" pain of that sin has never been far from his mind.

"I go to bed thinking about it. I get up thinking about it. I think about it all day long," he said in an interview Thursday (Sept. 20), noting his daily prayers for the victims and the sadness for "what some of our priests and bishops have done … our family sin is known, and it should be. But it's known. And it hurts, it hurts."

It is what the Rev. Thomas Rosica, a Vatican adviser, has called "the summer from hell for the Catholic Church," another reckoning 16 years after The Boston Globe's investigation into widespread clergy abuse and a systematic coverup prompted major changes in church operations. And it is more than 30 years since the Rev. Gilbert Gauthe's history of child abuse was exposed, along with the complicit deceit of church leaders in the Diocese of Lafayette.

The sins of the priests have always been magnified by the active role church leaders played in covering up the crimes and transferring the offender to prey on new victims.

"Priests were raping little boys and girls," the Pennsylvania grand jury wrote in its report, "and the men of God who were responsible for them not only did nothing; they hid it all. For decades."

That is why Aymond's expressions of sorrow, sadness and pain are difficult to accept. Aymond said he understands the skepticism and reluctance.



"As church leaders, in many ways," he said from the pulpit at St. Louis Cathedral in late August, "we have lost your trust and I am keenly aware of that. We want to regain that trust. And we know that it will take a long time."

Without ignoring the past, Aymond said, it is his responsibility to move the church forward.

He points out that some of the church's decisions from decades ago were based on a mistaken belief that pedophilia "could be cured" and offending priests could be returned to ministry, a practice that has long since been replaced with zero tolerance and the immediate dismissal of any priest "credibly accused" of child abuse.

He also believes that <u>The Charter for the Protection of Children and Young People</u>, a policy created by the U.S. bishops in the wake of the Boston scandal to set up Safe Environment programs and training, strengthen mandatory reporting policies and other actions to protect children, has been effective.

While the church continues to deal with allegations of abuse from decades ago, Aymond said, there have been no credible claims of new abuses in the Archdiocese of New Orleans for more than 10 years.

"The grand jury report from Pennsylvania said there were 1,000 kids and 300 priests" involved," Aymond said. "And do you know many of those cases were after 2002? ... Two. And they were immediately given to the police. It doesn't make up for the sin of the past, but some things are happening, we have them in place, we're doing them."

A <u>2004 study by an independent research team at the John Jay College of Criminal Justice</u> found that acts of child sexual abuse by Catholic clergy in the United States peaked

in the mid-1980s. It found that 4 percent of Catholic priests were abusing minors at the height of the crisis. That number is now estimated to be less than 1 percent.

"One case of sexual abuse of a minor is one case too many," Aymond said. "A kid's life can be destroyed ... So, one is one too many. And we need to reach out to them, to love them, to care for them to provide counseling, to help them to be able to be healed. But there is a big difference since 2002."

Aymond said that all complaints of abuse against a minor are immediately reported to police and that an outside auditing firm is hired to annually check the diocese's compliance with the Charter for Protection of Children. Results are published on the church's website.

Victims, their families, church critics and others say the biggest step toward healing would be true transparency, an opening of the records to name all the priests who were found to be credibly accused of child sex abuse.

Aymond said he was the one who brought up the issue a meeting this month with his fellow Louisiana bishops, but he declined to commit and said that such a decision would be made by all the state's bishops together.

This is where the archbishop of New Orleans should summon his powers of leadership to make this happen. If the church has truly mended its ways, this will confirm it.  Evil hates the light and horrible things are done in secret.

*Tim Morris is a columnist on the Latitude team at NOLA.com | The Times-Picayune. Latitude is a place to share opinions about the challenges facing Louisiana. Follow @LatitudeNOLA on Facebook and Twitter. Write to Tim at tmorris@nola.com.*

Note to readers: if you purchase something through one of our affiliate links we may earn a commission.

**SPONSOR CONTENT**

# Generals of World War 2 That Were Aboslutely Terrible 



**By Ranker**

These bad generals blundered into defeats, hampered their
own troops, and cracked under pressure time and time
again. Whether Allied or Axis, this is a list of the worst World
War II generals that ever...

Learn More



Use of and/or registration on any portion of this site constitutes acceptance of our
**User Agreement** (updated 5/25/18) and **Privacy Policy and Cookie Statement**
(updated 5/25/18).

© 2019 Advance Local Media LLC. All rights reserved (**About Us**).
The material on this site may not be reproduced, distributed, transmitted, cached or
otherwise used, except with the prior written permission of Advance Local.

**Community Rules** apply to all content you upload or otherwise submit to this site.

**Your California Privacy Rights**

▷ **Ad Choices**





## Archdiocese of New Orleans

7887 Walmsley Avenue
New Orleans, LA 70125-3496
Office: (504) 861-9521
Fax (504) 314-9614
Email: archbishop@arch-no.org

Office of the Archbishop

June 22, 2018

To Fr. Jonathan Hemelt, Pastor and parishioners of Our Lady of the Rosary and the people of God in our Archdiocese

Dear Sisters and Brothers in Christ:

This communication is to discuss with you allegations of sexual abuse by George Brignac. Mr. Brignac served at Our Lady of the Rosary after his diaconate ordination as a deacon from 1976 until 1988. The recent report relates to an allegation that occurred during this time period almost 40 years ago but reported to the Archdiocese of New Orleans four months ago.

It is noted that there were other allegations and criminal charges brought against Mr. Brignac in the past, of which he was acquitted or charges refused by the District Attorney's Office at that time. Archbishop Hannan publicly removed him from ministry in 1988. According to our records and files he worked as a teacher at St. Francis Cabrini School, St. John Vianney Prep, and St. Matthew the Apostle all in the Archdiocese of New Orleans prior to his ordination. He served as a deacon and teacher at Our Lady of the Rosary from 1976 to 1988 and for a time at Cabrini High School until he was removed from ministry. He had no other assignments. Since 1988 he has not served as a deacon in a parish, school, or any ministry of the Archdiocese of New Orleans.

Our policy in regards to the Protection of Children and Young People is online and outlines the steps and processes taken when an allegation is received and is in alignment with the US Catholic Bishops Charter for the Protection of Children and Young People. Upon receiving the lawsuit detailing the allegations, we acted quickly and pastorally according to these policies and practices. No one should suffer abuse and especially not by a church leader.

I am firmly committed to healing for victims of abuse. I have met with abuse victims and will always make the offer to meet with those who come forward with allegations of abuse. I am also committed to continuing to be transparent in the handling of allegations of abuse. I pray daily for those who have suffered abuse, especially those affected by clergy.

If anyone has any information regarding abuse by a member of the clergy or anyone serving in the Archdiocese of New Orleans, I encourage you to come forward and report this. We take allegations seriously and investigate them thoroughly. We, and I personally, are committed to making our parishes, schools, and ministries a safe place for all, especially the young church. We desire to provide real opportunities for healing for those hurt by the Catholic Church. I extend my pastoral care and compassion to Fr. Hemelt and parishioners of Our Lady of the Rosary, Holy Rosary School community, St. Matthew the Apostle School community, and Cabrini High School community.

To all who have been abused, I pray that you know the healing of Christ. I lift you to the Lord that you may know God's peace.

Wishing you God's blessings, I am

Sincerely in Christ,

✝ _(signature)_

Most Reverend Gregory M. Aymond
Archbishop of New Orleans

**EXHIBIT**
12



NO. 2005-C-0915

COURT OF APPEAL, FOURTH CIRCUIT

STATE OF LOUISIANA

GERALD P. KINANE

VERSUS

ARCHBISHOP ALFRED HUGHES, ET AL

IN RE:          THE ROMAN CATHOLIC CHURCH, ETC.

APPLYING FOR: SUPERVISORY WRIT

DIRECTED TO:   HONORABLE ETHEL SIMMS JULIEN, JUDGE
               CIVIL DISTRICT COURT, ORLEANS PARISH
               DIVISION "N", 2005-1612

WRIT DENIED.

    We find no error in the trial court judgment overruling relator's exception of

lack of subject matter jurisdiction. *See, Gorman v. Swaggert*, 524 So.2d 915

(La.App. 4 Cir. 1988).

    New Orleans, Louisiana this 29 day of June, 2005.


                    _____
                    JUDGE DAVID S. GORBATY


                    _____
                    JUDGE JAMES F. MCKAY, III


                    _____
                    JUDGE EDWIN A. LOMBARD

                                          JUN 29 2005

EXHIBIT
13



NO. 2010-C-0251

COURT OF APPEAL, FOURTH CIRCUIT

STATE OF LOUISIANA

GERARD P. KINANE

VERSUS

ARCHBISHOP ALFRED HUGHES, ET AL.

IN RE:           THE ROMAN CATHOLIC CHURCH OF THE
                 ARCHDIOCESE OF NEW ORLEANS, ET AL.

APPLYING FOR: SUPERVISORY WRIT

DIRECTED TO:  HONORABLE ETHEL SIMMS JULIEN
              CIVIL DISTRICT COURT, ORLEANS PARISH
              DIVISION "N-8", 2005-1612

**WRIT GRANTED IN PART; DENIED IN PART**

On application for supervisory writ, the relators seek review of the trial

court's partial denial of their Motion for Summary Judgment. After *de novo*

review, we grant in part and deny in part.

***Relevant Facts and Procedural History***

In February 2005, the Gerard P. Kinane (the plaintiff), a Catholic priest,

instituted this action against the Archbishop Alfred C. Hughes and The Roman

Catholic Church of the Archdiocese of New Orleans (the relators), alleging

defamation, intentional infliction of emotional distress, and invasion of privacy as

a result of relators' March 24, 2004, press conference where it was revealed that an

allegation of sexual misconduct had been received against the plaintiff and that,



1

Cynthia Stombos
Deputy Clerk



EXHIBIT
14

effective March 23, 2004, his priestly faculties had been withdrawn and he had been placed on administrative leave.

The relators moved for summary judgment, arguing that there was no evidence to support the plaintiffs' claims for defamation, intentional infliction of emotional distress, and invasion of privacy. In addition, the relators asserted that, pursuant to the First Amendment of the United States Constitution, the trial court lacked subject matter jurisdiction to hear plaintiff's claims. The trial court granted the relators' motion in part, dismissing plaintiff's defamation claim, but denied relators' motion in all other respects.

On application for supervisory writ, the relators argue that it was error to deny summary judgment on the intentional infliction of emotional distress and invasion of privacy claims. In addition, the relators argued that the trial court erred in determining that it had subject matter jurisdiction to hear the matter.

*Applicable Law*

In order to recover damages associated with the tort of intentional infliction of emotional distress, a plaintiff must establish the following: (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. *White v. Monsanto*, 585 So.2d 1205, 1209 (La. 1991).

There are four different types of actions that may fall under an invasion of privacy claim in Louisiana,: (1) the appropriation of an individual's name or likeness, for the use or benefit of the defendant; (2) an unreasonable intrusion by the defendant upon the plaintiff's physical solitude or seclusion; (3) publicity that unreasonably places the plaintiff in a false light before the public; and (4) unreasonable public disclosure of embarrassing private facts. *Jaubert v. Crowley*

2

*Post-Signal, Inc.,* 375 So.2d 1386 (La. 1979). In order to recover damages associated with the tort of an (actionable) invasion of privacy, a plaintiff must prove that the defendant's conduct was unreasonable and seriously interfered with plaintiff's privacy interest. *Id at 1389.* The reasonableness of the defendant's conduct is determined by balancing the conflicting interests at stake –the plaintiff's interest in protecting his privacy interest from serious invasions, and the defendant's interest in pursuing his course of conduct. *Id.; see also, Aranyosi v. Delchamps, Inc.,* 98-1325, p. 11 (La. App. 1 Cir. 6/25/99), 739 So.2d 911, 918. (where the defendant's action is properly authorized or justified by circumstances, it is deemed to be reasonable and non-actionable, even though it admits to a slight invasion of the plaintiff's privacy; a plaintiff's right to privacy is limited by society's right to be informed about legitimate subjects of public interest).

***Discussion***

In opposition to the relators' motion for summary judgment, the plaintiff only submits a self-serving and conclusory affidavit stating that the "the publicity generated by [relators] at the March 24, 2004, press conference violated his privacy, placed him in a false light, and [] caused him extreme and severe injury." The plaintiff argues that the very act of holding a press conference to make public allegations of sexual misconduct against a priest is extreme and outrageous, but he does not submit deposition or affidavit testimony of any party, person, or entity in support of his argument that the relators' act was "so outrageous in character, and so extreme in degree, [that it went] beyond all possible bounds of decency, and [was] to be regarded as atrocious and utterly intolerable in a civilized community." *White* at 1209. Moreover, the plaintiff fails to produce even a transcript of the statements made by relators at the press conference or any copies of any publications resulting from the press conference at issue, although he alleges in his

3

petition that, following the press conference at issue, The Times-Picayune ran a

front-page article titled "Another Local Priest Removed in Sex Case."

The plaintiff submits no deposition or affidavit testimony of himself or any

other person or entity to support his claim that the relators' conduct caused him

emotional distress. Rather, the plaintiff's deposition testimony indicates that he

was seeking counseling for depression, stress, and anxiety due to allegations

against him but he refused to identify which allegations caused him such ailments.

Likewise, although the plaintiff stated in his deposition that being placed on

administrative leave caused him "[a] great deal" of depression, stress, and/or

anxiety,[1] there is no indication that his depression or stress was a result of relators'

conduct in holding the press conference at issue. Similarly, in his affidavit, the

plaintiff states conclusively that "[t]he publicity generated by [the relators] at the

March 24, 2004, press conference violated his privacy, placed him in a false light,

and has caused him extreme and severe injury," but does not indicate whether the

"injury" suffered by plaintiff was that of emotional distress or supply any specific

---

[1]      The transcript from plaintiff's deposition submitted by the relators in support of their motion for summary judgment reveals the following pertinent dialogue:

Q.      As far as the counseling by Dr. Galloway, the Ph.D., Dr. Galloway, has he prescribed anything?
A.      He is not a medical doctor. He can't.
Q.      Well, are you taking anything?
A.      No.
Q.      That's all I'm trying to figure out.
A.      Okay.
Q.      So you are not on any medications for mental issues?
A.      None.
Q.      What type [sic] of mental problems are you having that you seek counseling for, therapy?
A.      Depression.
Q.      Okay.
A.      Stress, anxiety. I guess that's basically it.
Q.      Now, did the fact —I don't know if you are going to let him answer this or not, but I mean, I don't know. Did the fact that allegations were brought against you or made against you, did that cause you any depression [sic] stress, or anxiety?
A.      Definitely.
Q.      Okay.
A.      That's why I went to see him.
Q.      Okay. Because allegations were made by an adult that you had done something to this adult when he was a minor, because those allegations were made?
A.      I'm not going —I'm going to defer to my attorney.
Q.      All right. Did the fact that you were put on administrative leave by Archbishop Hughes cause you any depression, stress, or anxiety?
A.      A great deal.

4

facts showing that there is a genuine issue for trial. Moreover, even assuming emotional distress as a result of the press conference, there is no evidence that the emotional distress was severe "such that no reasonable person could be expected to endure it," *White* at 1210, nor is there evidence that the relators desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. Likewise, the record is devoid of any evidence that relators' conduct, regardless of whether it was reasonable or not, "seriously interfered with plaintiff's privacy interest." *Jaubert*, 375 So.2d at 1389. Rather, the plaintiff self-serving and conclusory affidavit states that the publicity generated by relators' press conference violated his privacy but submits no evidence to establish that a violation of privacy. The record contains no evidence that relators placed plaintiff in a false light or publicly revealed embarrassing facts about him at the press conference and, although public revelation of allegations of sexual misconduct may be embarrassing, the plaintiff submits no evidence that such was the case here.

### Conclusion

After *de novo* review, we find that the plaintiff fails to meet his burden on summary judgment of showing the existence of a genuine issue of material fact and, therefore, that the trial court erred in denying summary judgment on the plaintiffs' claims for intentional infliction of emotional distress and invasion of privacy. Accordingly, the relators' application for supervisory writ is granted in part and summary judgment is rendered in favor of the relators on the plaintiffs' claims for intentional infliction of emotional distress.

The trial court did not err in determining that it has subject matter jurisdiction, *see Kinane v. Hughes*, unpub., 2005-0915 (La. App. 4 Cir. 6/29/05), *writ denied*, 2005-1962 (La. 2/3/06), 922 So.2d 1183, and, accordingly, the relators

5

application for supervisory writ is denied in part with regard to the issue of subject matter jurisdiction.

New Orleans, Louisiana this ___18th___ day of ___MAY___, _2010_.


_____
JUDGE EDWIN A. LOMBARD

_____
CHIEF JUDGE JOAN BERNARD ARMSTRONG

_____
JUDGE DENNIS R. BAGNERIS


_____**BELSOME, J., DSSENTS**_____
JUDGE ROLAND L. BELSOME


BONIN, J., CONCURS IN THE RESULT ONLY AND ASSIGNS REASONS
_____
JUDGE PAUL A. BONIN

A TRUE COPY
NEW ORLEANS

MAY 1 8 2010

Danielle Schott CLERK
COURT OF APPEAL FOURTH CIRCUIT

GERARD P. KINANE                    *       NO. 2010-C-0251

VERSUS                               *       COURT OF APPEAL

ARCHBISHOP ALFRED                    *       FOURTH CIRCUIT
HUGHES, ET AL.
                                     *       STATE OF LOUISIANA

                                     *

                                     *
                        * * * * * * *


BELSOME, J., DISSENTS

        I would deny the writ.

| GERARD P. KINANE | * | NO. 2010-C-0251 |
|---|---|---|
| VERSUS | * | COURT OF APPEAL |
| ARCHBISHOP ALFRED HUGHES, ET AL. | * | FOURTH CIRCUIT |
| | * | STATE OF LOUISIANA |
| | * | |
| | * | |

\* \* \* \* \* \* \*



**BONIN, J., CONCURS IN THE RESULT ONLY AND ASSIGNS REASONS.**

I respectfully concur in the result which dismisses this suit.

While I have no quarrel with the majority opinion's legal analysis of the lack of evidentiary support for Father Kinane's claims against Archbishop Hughes and the Archdiocese of New Orleans for intentional infliction of emotional distress and for invasion of privacy, I do not believe that we should reach the "merits" of such claims. In my view, based upon the evidence presented in this case, the Religion Clauses of the First Amendment, as applied to the states by the Fourteenth Amendment, prohibit our inquiry into the claims asserted by Father Kinane and require us to carefully reconsider the applicability of a line of cases and decisions upon which our court has relied in similar cases.[1]

I

In this case, the archbishop and the archdiocese have introduced through the affidavit of the Very Reverend Gerald Seiler, who holds a licentiate in the canon law of the Roman Catholic Church, three documents which establish that the archdiocese has an internal ecclesiastical governance policy concerning the consequences for a priest, such as Father Kinane, when a complaint has been

---

[1] Those cases and decisions include *Gorman v. Swaggert*, 524 So. 2d 915 (La. App. 4 Cir. 1988), *Hayden v. Schulte*, 97-0422 (La. App. 4 Cir. 10/29/07), 701 So. 2d 1354, *Schmaltz v. Hughes*, unpub., 2004-1859 (La. App. 4 Cir. 10/26/04), *Fraser v. Archbishop Alfred Hughes*, unpub., 2005-0706 (La. App. 4 Cir. 5/27/05), *Fraser v. Archbishop*

received by the church authorities that the priest is accused of the sexual abuse of a minor. These documents are (1) Archdiocese of New Orleans Policy Concerning Abuse or Neglect of Minors (the Policy), (2) Charter for the Protection of Children and Young People Revised Edition, published by the United States Conference of Catholic Bishops (the Charter), and (3) Essential Norms for Diocesan/Eparchal Policies Dealing with Allegations of Sexual Abuse of Minors by Priests and Deacons, approved by the Congregation of Bishops (the Norms). The Norms "received *recognitio* of the Apostolic See . . . [and] constitute particular law for all the dioceses/eparchies of the United States of America."

The Policy at Part VII, Article 7(a) provides:

> At all times the Archbishop has the executive power of governance, through an administrative act, to remove the offending cleric from office, to remove or restrict his faculties, and to limit his exercise of priestly ministry. Because sexual abuse of a minor by a cleric is a crime in the universal law of the Church (c. 1395 §2) and is a crime in all jurisdictions in the United States, for the sake of the common good and observing the provisions of canon law, the Archbishop shall exercise this power of governance to ensure that any priest who has committed even one act of sexual abuse of a minor shall not continue in active ministry.

The Preamble of the Charter opens with the following background:

> The Church in the United States is experiencing a crisis without precedent in our times. The sexual abuse of children and young people by some priests and bishops, and the ways in which we bishops addressed these crimes and sins, have caused enormous pain, anger, and confusion. Innocent victims and their families have suffered terribly. *In the past, secrecy* has created an atmosphere that has inhibited the healing process, and, *in some cases, enabled sexually abusive behavior to be repeated.* As bishops, we acknowledge our mistakes and our role in that suffering, and we apologize and take responsibility for too often failing victims and our people in the past. *We also take responsibility for dealing with this problem strongly, consistently, and effectively in the future.* From the depths of our hearts, we bishops

---

*Alfred Hughes*, unpub., 2010-0512 (La. App. 4 Cir. 5/10/10), and even *Kinane v. Hughes*, unpub., 2005-0915 (La. App. 4 Cir. 6/29/05).

express great sorrow and profound regret for what the
Catholic people are enduring. (emphasis added)

The Norms, at footnote 7, provide that

> The necessary observance of the canonical norms
> is not intended in any way to hinder the course of any
> civil action that may be operative. *At the same time, the
> Church reaffirms her right to enact legislation binding
> on all her members concerning the ecclesiastical
> dimensions of the delict of sexual abuse of minors.*
> (emphasis added)

This is compelling evidence that the disciplining of its priests is not the only

matter of church law and governance for the archdiocese, but so is the manner in

which it *communicates* the imposition of that discipline not only to its own

adherents or members but to the members of the public. Clearly, in this case, the

archdiocese and the archbishop have established that current church governance

rejects secrecy when it imposes its discipline upon its priests in matters involving

the sexual abuse of minors.

## II

Father Kinane does not question his archbishop's authority to remove him

from the active ministry of the priesthood and place other restrictions upon him.

He even suggests that he would have found unobjectionable a course of action

whereby the archbishop would have limited his communication about the

discipline of Father Kinane to local parishioners while not disclosing to them or

anyone else the factual or canonical basis for that discipline, that is that the

archbishop had received a complaint that Father Kinane had sexually abused a

minor. In other words, and importantly for our purposes, Father Kinane would

substitute his judgment for that of his church law about the reasonableness of not

keeping secret the cause of its discipline of him.

Moreover, Father Kinane's petition gives us clear guidance as to what

would be necessary for him to prove in the civil court. First, he would have the

finder of fact determine that the archbishop did not properly apply the Norms in his case. Presumably, this would necessarily entail expert testimony from canon lawyers about procedural and substantive matters of the Catholic Church's governance and would require a civil court to decide whether canon law was correctly interpreted and applied. Second, as his petition clearly indicates, Father Kinane wants to have the finder of fact decide that Archbishop Hughes' personal motives predominated over his ecclesiastical responsibilities and duties when he chose to publicly announce his discipline of Father Kinane. In the colorful language of his petition, Father Kinane alleges in the "Feeding the Lions" section that the decision to publicize his discipline "was calculated to distract the public's attention from Defendant Hughes' prior history of stealth and deception," the sordid details of which Father Kinane had earlier, and ironically, catalogued, repeated and republished in *his* publicly-filed allegations. Archbishop Hughes' misconduct as alleged by Father Kinane seems to be a particular instance of the very type of prior church governance for which the bishops apologized in the Charter and set out to remediate. Father Kinane's suit would have the factfinder decide whether the communication of his discipline to the public at large at the direction of the archbishop was an act of distraction or, in a manner of speaking, an act of contrition.

Thus, Father Kinane's claims themselves necessarily put at issue the proper interpretation and application of church governing laws and the resolution of the motivations of those who are the lawmakers and the executives of church laws.

### III

Of course, meddling in the governance of churches is precisely what the Religion Clauses prohibit. We cannot constitutionally choose between conflicting views about whether the archbishop has properly interpreted and applied the Norms of his own church. This is the precise lesson of *Serbian Eastern Orthodox*

*Archdiocese for United States of America and Canada v. Milivojevich*, 426 U.S.

696 (1976). The Illinois courts had involved themselves in an internal church

dispute concerning the governance of the American branch of an international

church and had undertaken to decide whether the Mother Church had correctly or

arbitrarily applied its own laws; the Illinois Supreme Court had gone so far as to

interpret the constitution of the Mother Church. The United States Supreme Court

held:

> In short, the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decision as binding upon them.

*Milivojevich*, 426 U.S. at 724-725.

Even earlier the United States Supreme Court had emphasized the

constitutional restrictions on the civil courts involving themselves in internal

church matters. In *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church

in North America*, 344 U.S. 94 (1952) the Court addressed a New York statute

which attempted to wrest the ownership of church property away from the control

of the Patriarch in Moscow who was viewed during the Cold War period as the

puppet of the Russian Soviet Communist government and not a true religious

leader, especially of the Russian refugees in America. In striking down the

legislation, the Supreme Court held:

> Ours is a government which by the "law of its being" allows no statute, state or national, that prohibits the free exercise of religion. There are occasions when civil courts must draw lines between responsibilities of church and state for the disposition or use of property. *Even in those cases when the property right follows as an incident from decisions of the church custom or law on ecclesiastical issues, the church rule controls. This*

> under our Constitution necessarily follows in order that
> there may be free exercise of religion.

*Kedroff,* 344 U.S. at 120-121 (emphasis added).

In *McManus v. Taylor,* 521 So. 2d 449, 450 (La. App. 4ᵗʰ Cir. 1988), our court was presented with a controversy in which Judge Schott identified that "[t]he principle issue is whether the court has jurisdiction over an ostensible defamation suit whose pleadings reveal that the actual claim is over the administration of church rules by governing bodies of the church." *McManus* was a controversy between a minister and his State Overseer over the manner in which the State Overseer had interpreted and applied the "minutes" of the General Assembly of the Church of God. Referencing *Joiner v. Weeks,* 383 So. 2d 101 (La. App. 3ʳᵈ Cir. 1980) in which the court had described as "ludicrous to believe that the constitutional principles upheld by the United States Supreme Court in *Milivojevich* could be satisfied by allowing this intrusion into the disciplinary proceedings of an ecclesiastical board," Judge Schott observed that:

> The present case is indistinguishable. *Plaintiff would
> have our courts investigate the propriety of proceedings
> conducted by his church in the interpretation and
> application of church rules. He would subject his church
> authorities to a defamation case based upon the
> performance of their duties in the administration of their
> church.* [citations omitted] Accordingly, we have
> concluded that the exception of lack of jurisdiction over
> the subject matter was erroneously overruled.

*McManus,* 521 So. 2d at 451 (emphasis added).

The Religion Clauses render us incompetent to substitute our judgment for that of church authorities in interpreting and applying, as Father Kinance would have us do, the Roman Catholic Church's Essential Norms for Diocesan/Eparchal Policies Dealing with Allegations of Sexual Abuse of Minors by Priests and Deacons insofar as they govern the discipline of its priests and the communication of that discipline to the public. For that reason, the summary judgment should

*under our Constitution necessarily follows in order that there may be free exercise of religion.*

*Kedroff,* 344 U.S. at 120-121 (emphasis added).

In *McManus v. Taylor,* 521 So. 2d 449, 450 (La. App. 4th Cir. 1988), our court was presented with a controversy in which Judge Schott identified that "[t]he principle issue is whether the court has jurisdiction over an ostensible defamation suit whose pleadings reveal that the actual claim is over the administration of church rules by governing bodies of the church." *McManus* was a controversy between a minister and his State Overseer over the manner in which the State Overseer had interpreted and applied the "minutes" of the General Assembly of the Church of God. Referencing *Joiner v. Weeks,* 383 So. 2d 101 (La. App. 3rd Cir. 1980), in which the court had described as "ludicrous to believe that the constitutional principles upheld by the United States Supreme Court in *Milivojevich* could be satisfied by allowing this intrusion into the disciplinary proceedings of an ecclesiastical board," Judge Schott observed that:

> The present case is indistinguishable. *Plaintiff would have our courts investigate the propriety of proceedings conducted by his church in the interpretation and application of church rules. He would subject his church authorities to a defamation case based upon the performance of their duties in the administration of their church.* [citations omitted] Accordingly, we have concluded that the exception of lack of jurisdiction over the subject matter was erroneously overruled.

*McManus,* 521 So. 2d at 451. (emphasis added)

The Religion Clauses render us incompetent to substitute our judgment for that of church authorities in interpreting and applying, as Father Kinane would have us do, the Roman Catholic Church's Essential Norms for Diocesan/Eparchal Policies Dealing with Allegations of Sexual Abuse of Minors by Priests and Deacons insofar as they govern the discipline of its priests and the communication of that discipline to the public. For that reason, the summary judgment should

have been granted on the ground that we lack of jurisdiction over the subject matter and moreover, because of the evidence submitted in this case, we should not even decide today whether Father Kinane can prove his claims for intentional infliction of emotional distress and for invasion of privacy.

By even entertaining the merits of these types of claims for damages by accused priests, we judges as government officials countenance a "chilling effect" upon the free exercise of their religion by Catholics. *See Laird v. Tatum*, 408 U.S. 1, 11-13 (1972) and cases cited therein ("The decisions in these cases fully recognize that governmental action may be subject to constitutional challenge even though it has only an indirect ["deterrent, or 'chilling'"] effect on the exercise of First Amendment rights."). The threat alone of a lawsuit can have such a chilling effect. *See S.G. v. City of Monroe*, 37,103 (La. App. 2 Cir. 4/11/03), 843 So.2d 657, 662. Finally, there is the concern expressed in *National Labor Relations Board v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979). While not disposed of strictly on constitutional grounds, the Supreme Court rejected the NLRB's assertion of jurisdiction over lay teachers and employees of religious schools:

> The resolution of such charges by the Board, in many instances, will *necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators* and its relationship to the school's religious mission. It is not only the conclusions that may be reached by the Board which *may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry* leading to findings and conclusions.     (emphasis added)

Accordingly, I would grant relief exclusively on the grounds that the Religion Clauses prohibit our consideration of these types of lawsuits and claims.

IV

Not one iota of what I have written should be misconstrued that the Religion

Clauses insulate or shield any church or religion, its dignitaries, or its ministers

from liability to victims of sexual abuse. *See Hayden v. Schulte,* 97-0422 (La. App.

4 Cir. 10/29/97), 701 So. 2d 1354, 1356 ("The Church cannot appropriate a matter

with secular criminal implications by making it simultaneously a matter of internal

Church policy and discipline.") *See also* Jason Berry, *Lead Us Not Into*

*Temptation: Catholic Priests and the Sexual Abuse of Children* (Doubleday

Religious Publishing Group, 1994).

# NO. 2005-C-0706

## COURT OF APPEAL, FOURTH CIRCUIT

## STATE OF LOUISIANA

**RECEIVED**
**MAY 31 2005**
**CIVIL DISTRICT COURT**

### MICHAEL FRASER

### VERSUS

## ARCHBISHOP ALFRED HUGHES AND THE ARCHDIOCESE OF NEW ORLEANS

IN RE:          ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS, ETC

APPLYING FOR: SUPERVISORY WRIT

DIRECTED TO:   HONORABLE LLOYD J. MEDLEY, JUDGE
               CIVIL DISTRICT COURT, ORLEANS PARISH
               DIVISION "D", 2005-292

**WRIT DENIED**

We find no error in the trial court judgment overruling relators' exception of lack of subject matter jurisdiction. See, *Gorman v. Swaggart*, 524 So.2d 915 (La.App. 4 Cir. 1988).

New Orleans, Louisiana this _27TH_ day of _MAY_, _2005._

_____
JUDGE MICHAEL E. KIRBY

_____
JUDGE PATRICIA RIVET MURRAY

DAVID CHAPUTE-

_____
JUDGE JAMES F. MCKAY III

A TRUE COPY
NEW ORLEANS

MAY 27 2005

_____ CLERK
COURT OF APPEAL FOURTH CIRCUIT

*150375* 150375

**EXHIBIT**
**15**

NO. 2010-C-0512

COURT OF APPEAL, FOURTH CIRCUIT

STATE OF LOUISIANA



MICHAEL B. FRASER

VERSUS

ARCHBISHOP ALFRED HUGHES, ET AL.

IN RE:            THE ROMAN CATHOLIC CHURCH OF THE
ARCHDIOCESE OF NEW ORLEANS, ET A L.

APPLYING FOR: SUPERVISORY WRIT

DIRECTED TO:  HONORABLE LLOYD J. MEDLEY , JR.
              CIVIL DISTRICT COURT, ORLEANS PARISH
              DIVISION "D-16", 2005-00292

**WRIT APPLICATION GRANTED IN PART AND DENIED IN PART**

Defendants seek review of the trial court's denial of their motion for

summary judgment on the issues of intentional infliction of emotional distress,

invasion of privacy and lack of subject matter jurisdiction.  For the reasons that

follow, we grant the application and reverse the trial court's denial of summary

judgment as to the claims of intentional infliction of emotional distress and

invasion of privacy; in all other respects, the writ application is denied.

**FACTS AND PROCEEDINGS BELOW**

This litigation arises from an allegation received by the Roman Catholic

Archdiocese of New Orleans on January 13, 2004, that the plaintiff, a diocesan

priest, had sexually molested a juvenile in 1985 or 1986 while he was pastor at Sts.

Peter and Paul Parish in Pearl River, Louisiana.  The Archdiocese informed the

plaintiff of the allegation on January 14, 2004.  The Archdiocese told plaintiff that

a preliminary investigation would be conducted and that the plaintiff would be



Regina Crock
Deputy Clerk

EXHIBIT
16

placed on administrative leave and his "priestly faculties" withdrawn during the investigation. On January 24, 2004, the Archdiocese conducted a press conference at which it was stated that the Archdiocese had received an allegation of sexual misconduct against the plaintiff and that the plaintiff had been placed on administrative leave and his priestly faculties withdrawn, effective January 14, 1004.

Plaintiff filed the instant suit on January 7, 2005, asserting claims for defamation and libel, invasion of privacy and intentional infliction of emotional distress as a result of the press conference and the disclosure of the allegation. Defendants filed a motion for summary judgment asserting that the plaintiff would not be able to prove his claims and that the court lacked subject matter jurisdiction because plaintiff asserts that the defendants failed to act in conformity with the policies of the Archdiocese of New Orleans and the Roman Catholic Church.

After a hearing on February 26, 2010, the trial court on March 5, 2010, granted summary judgment as to plaintiff's claim for defamation and libel, but denied summary judgment as to intentional infliction of emotional distress, invasion of privacy and lack of subject matter jurisdiction.

**EVIDENCE**

In support of their motion for summary judgment, the defendants produced affidavits from Archbishop Hughes, Fr. Gerald Seiler and Fr. William Maestri, as well as the plaintiff's deposition testimony. Archbishop Hughes stated in his affidavit that (1) on or about January 12, 2004, the Archdiocese received an allegation that the plaintiff had sexually abused a minor between 1985 – 1986, while plaintiff served as pastor of Sts. Peter and Paul Parish; (2) in response to the allegation, he placed the plaintiff on administrative leave and withdrew his priestly faculties, effective January 14, 2004; and (3) on January 14, 2004, he informed the plaintiff that an allegation of sexual misconduct had been made against him and

2

advised the plaintiff that he had been placed on administrative leave and his priestly faculties withdrawn, effective January 14, 2004.

Fr. Gerald Seiler testified in his affidavit that (1) he was an ordained priest of the Roman Catholic Church; (2) he was the Chancellor of the Archdiocese of New Orleans; (3) he obtained a pontifical license in canon law in 1996; (4) as a canon lawyer, he has personal knowledge of the status of a priest under the law of the Roman Catholic Church; (5) under canon law, a priest of the diocese is subject to the authority of the bishop of the diocese to which the priest belongs in regards to how and when a priest can celebrate Mass and represent himself as being a priest of the Roman Catholic Church; and (6) in January 2004, the plaintiff was the pastor of a church parish within the Archdiocese of New Orleans.

Fr. William Maestri, director of the Archdiocese of New Orleans Office of Communication, stated in his affidavit that he conveyed the following information to the media during the press conference on January 24, 2004:

> A) The Archdiocese of New Orleans had received an allegation of sexual misconduct against Reverend Rev. (sic) Michael Fraser, a priest of the Archdiocese.
> B) Archbishop Alfred C. Hughes had placed Rev. Michael Fraser on administrative leave and his priestly faculties had been withdrawn, effective January 14, 2004.

The plaintiff stated in his deposition that he filed suit against the defendants because they made the statements in the press conference without any physical proof of the accusation or speaking with the accuser. He contends that the defendants defamed his character in holding the press conference. The plaintiff testified that Fr. Becnel, then Director of Priest Personnel, called and informed him of the accusation, that there would be a meeting of the review board and that a press conference would be held on January 25th. He listened to the press conference over the television but could not remember the exact words that were said. The plaintiff acknowledged that he was placed on administrative leave by

Archbishop Hughes, but is pursuing a review of the Archbishop's actions by the Vatican. The plaintiff refused to testify as to any information concerning the Vatican's review, contending that he was under an oath of silence. He acknowledged that he was sued in 1998 for the alleged sexual molestation of a minor but denied that he molested the minor. He stated that the Archdiocese had concluded that the allegations made in that lawsuit were not credible.

The defendants also introduced newspaper articles and DVDs of television news reports concerning the press conference as well as reports concerning a prior allegation of sexual misconduct against plaintiff. Information about the first allegation was obtained from court records in St. Tammany Parish, where the first accuser and his parents had filed suit against the Archdiocese and plaintiff. In fact, one of the DVDs includes a news story in which the father of the first accuser was interviewed.

In opposition to the motion for summary judgment, the plaintiff executed an affidavit in which he denies sexually molesting any minor and states that the publicity generated by the press conference "violated his privacy, placed him in a false light, and has caused him extreme and severe injury."

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

In order to recover for intentional infliction of emotional distress, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. White v. Monsanto Co., 585 So.2d 1205, 1209 (La. 1991).

The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Liability does not extend to mere

4

insults, indignities, threats, annoyances, petty oppressions, or other trivialities.
Persons must necessarily be expected to be hardened to a certain amount of rough
language and to occasional acts that are definitely inconsiderate and unkind. Id.
The extreme and outrageous character of the conduct may arise from an abuse by
the actor of a position, or a relation with the other, which gives him actual or
apparent authority over the other, or power to affect his interests. White v.
Monsanto Co., 585 So.2d at 1210.

In the instant case, there was no evidence presented to indicate that the
defendants' actions were outrageous or severe, that these actions were intended to
inflict severe emotional distress on the plaintiff, or that the plaintiff suffered severe
emotional distress. The plaintiff was not the only priest mentioned in the press
conference. The press conference had been conducted by the Archdiocese to
acknowledge that it had received allegations of sexual misconduct about a couple
of priests and that the Archdiocese was taking appropriate action to protect both its
parishioners and the priests. While plaintiff made the broad statement in his
affidavit that he suffered emotional distress as a result of the press conference, he
produced no evidence or testimony about treatment for the emotional distress or
examples of how the emotional distress evidenced itself.

We therefore find the trial court erred by denying the motion for summary
judgment on this issue.

**INVASION OF PRIVACY**

Louisiana courts have allowed tort actions for invasion of privacy, which
involves the basic right of a person to be let alone in his private affairs. An
unwarranted invasion of a person's right of privacy may give rise to liability for the
resulting harm. The determination of whether a person's conduct constitutes the
tort of invasion of privacy depends upon the facts and circumstances of each case.
Roshto v. Hebert, 439 So.2d 428 (La.1983). There are four different types of

actions that may fall under an invasion of privacy claim: (1) the appropriation of an individual's name or likeness, for the use or benefit of the defendant; (2) an unreasonable intrusion by the defendant upon the plaintiff's physical solitude or seclusion; (3) publicity that unreasonably places the plaintiff in a false light before the public; and, (4) unreasonable public disclosure of embarrassing private facts. Jaubert v. Crowley Post-Signal, Inc., 375 So.2d 1386 (La.1979).

The reasonableness of the defendant's acts is determined by balancing the interests of the plaintiff in protecting his privacy from serious invasions with the defendant's interest in pursuing his course of conduct. Jaubert, 375 So.2d 1386. Where the defendant's action is properly authorized or justified by circumstances, it is deemed reasonable and non-actionable, even though it admits to a slight invasion of the plaintiff's privacy. Parish National Bank v. Lane, 397 So.2d 1282 (La.1981). A defendant's duty is to avoid unreasonable invasions of plaintiff's "inviolate personality." There is no duty to avoid reasonable, accurate publicity because it embarrasses and offends. "Fault" flows from conduct which is unreasonable and contains falsity or fiction. Easter Seal Soc. For Crippled Children and Adults of Louisiana, Inc. v. Playboy Enterprises, Inc., 530 So.2d 643, 647 (La. App. 4 Cir. 1988).

It is initially the role of the court to determine whether false matter has the potential to place plaintiff in an objectionable false light; that is, the court initially determines as a matter of law whether defendant's conduct was unreasonable. In case of doubt or ambiguity, it then becomes a question for the trier-of-fact to determine whether, indeed, the publicity was understood to portray plaintiff in an objectionable way. The threshold question is a legal determination that requires a case-by-case analysis to illustrate the potential range of objectionable material. Roshto v. Hebert; Easter Seal Soc. For Crippled Children and Adults of Louisiana, Inc. v. Playboy Enterprises, Inc.

6

In the instant case, the plaintiff alleges that defendants unreasonably put him in a false light and exposed embarrassing facts as a result of the press conference. He contends that the archdiocese's statement classified him as pedophile. However, the defendants did not call him a pedophile. The affidavits, deposition testimony and other evidence presented indicate that the defendants did not call the defendant a pedophile. The defendants stated that they had received an allegation of sexual abuse and that the plaintiff was placed on administrative leave. It was not unreasonable for the defendants to make such a statement given that the plaintiff was a pastor at an Archdiocesan parish and the parishioners had to be told why plaintiff would not be serving as pastor. Additionally, the plaintiff had previously been accused of molesting a minor while a pastor at a parish in Pearl River, Louisiana, which information had already been made public.

In light of this evidence, we find that the trial court erred by denying the motion for summary judgment as to the claim for invasion of privacy.

## LACK OF SUBJECT MATTER JURISDICTION

The defendants also argue that the trial court should have granted the summary judgment because it did not have subject matter jurisdiction over the issues presented by the plaintiff. Defendants suggest that plaintiff alleges that the defendants did not act in accordance with their own internal polices concerning the discipline of priests and suffered damages as a result of their failure to act in accordance with the internal rules. Defendants' argument is premised on principles of religious freedom embodied in the First Amendment to the U.S. Constitution and La. Const. art. 1, § 8, which have been interpreted to forbid civil courts from interfering in the ecclesiastical matters of religious groups. Serbian Eastern Orthodox Diocese for the United States of America and Canada, et al. v. Milivojevich, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976); Glass v. First