UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | : | |
|---|---|---|
| J.W. DOE | : | NO. 20-cv-1321 |
|     Plaintiff, | : | |
| | : | |
| v. | : | JUDGE JANE TRICHE-MILAZZO |
| | : | |
| ARCHDIOCESE OF NEW ORLEANS | : | MAG. DONNA CURRALT |
| INDEMNITY, INC., et al | : | |
| | : | |
|     Defendants. | : | |
| | : | |

## MEMORANDUM IN SUPPORT OF MOTION TO DISQUALIFY

NOW INTO COURT comes Plaintiff J.W. Doe, through undersigned counsel, who respectfully submits the instant *Memorandum in Support of Motion to Disqualify* pursuant to 28 U.S.C. §§ 455(a)&(b). Doe respectfully submits that the Court should disqualify itself pursuant to Section 455(b) because its donations to Holy Name of Jesus Parish are in fact donations to Defendant Archdiocese of New Orleans. The Court's donations also benefitted co-defendant Fr. Hecker until last month since it helped pay for the retired priests' fund.

Doe also respectfully submits that the Court should disqualify itself pursuant to Section 455(a) because a disinterested, informed observer would question the impartiality of the Court based upon the donations and the Archbishop's ownership and control over Holy Name of Jesus. Disqualification is also proper where Holy Name of Jesus is a party in interest in the Archdiocese bankruptcy and has represented to the bankruptcy court that it will seek a channeling injunction to protect it from any claims of sexual abuse like the allegations in this case.[1]

---

[1] This case is currently on its third district court judge and third magistrate judge. [Rec. Doc. 104] Of the more than 23 cases removed from state court to this Court after the Archdiocese filed bankruptcy, the majority of judges in the Eastern District of Louisiana have recused themselves.

1

## BACKGROUND

Fr. Lawrence Hecker sexually assaulted JW Doe when he was a child. J.W. Doe was brought up a devout catholic. In 1968, he was a middle school student at St. Joseph catholic school in Gretna, Louisiana. The Archdiocese assigned Fr. Hecker to the school. One day, Father Hecker took Doe and a group of other schoolboys into the sacristy behind the alter of St. Joseph church where he instructed the boys to line up shoulder-to-shoulder and drop their pants. Father Hecker then told the boys that he would "show them what it was like to get a hernia exam." Father Hecker then sexually abused each boy one after the other by fondling and groping the boys' genitals.

On May 17, 2023, Doe filed a Second Motion to Unseal Hecker documents and for Criminal Referral. [Rec. Doc. 79.] On June 15, 2023, the Court conducted oral argument. [Rec. Doc. 108.] At oral argument, the Court disclosed for the first time that her spouse makes online contributions to her church in an amount and with a frequency the Court was unsure of.[2] *Transcript*, at 4, attached as Exhibit 1. Counsel for Plaintiff responded that he would discuss the disclosure with his client and let the Court know. Plaintiff himself was not present in the courtroom.

On June 16, 2023, the day after oral argument, the Court *sua sponte* scheduled a telephone status conference for June 22, 2023 to discuss "recusal issues". On the same day, undersigned sent the Court an email requesting additional information about the disclosure in order to better advise Plaintiff. The email requested the identity of the payments, the amount of the payments, the church and/or parish the payments were made to, the frequency of the payments, and whether

---

[2] The Archdiocese maintains an electronic record of all donations made by this Court and her spouse which it could have searched and disclosed. This creates a situation where both the Archdiocese and the Court are aware of the duration and amount of donations to Holy Name (factors relevant under Section 455(a)) but the Plaintiff is not.

there was any other personal or professional relationship between the Court and the Archdiocese or related entities. *EMAIL Gisleson to Judge Milazzo's Chambers*, at 1 (06/16/23), attached as Exhibit 2.

The Court responded to the email as follows: "Judge Milazzo made her complete disclosure in open court. She is (and has always been) a practicing Catholic. She and her husband are members of Holy Name of Jesus Church on St. Charles. They contribute to the same." *EMAIL Judge Milazzo's Chambers to Gisleson*, at 1 (06/20/23), attached as Exhibit 3. Undersigned responded that he would take the information to his client and advise the Court of the client's decision at the June 22, 2023 telephone status conference. *Id.*

On June 21, 2023, the next day, the Court *sua sponte* cancelled the telephone conference call scheduled for June 22, 2023 and directed the parties that any motion to disqualify should be filed no later than June 23, 2023 at 3:00pm. [Rec. Doc. 112]

**I.   Disqualification is required pursuant to 28 USC § 455(b) because a percentage of the Court's donations to Holy Name are paid to the Archdiocese as an assessment which also funds the priest retirement fund and any possible settlement in the bankruptcy.**

Plaintiff respectfully moves for disqualification pursuant to 28 U.S.C. §§ 455(b)(4). Section 455(b)(4) requires disqualification when a judge or her spouse "has a financial interest" in a "party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(4).

In this case, the Court disclosed that her spouse made donations (of an unknown amount or duration) to the church they both attend, Holy Name of Jesus. The Court indicated that the donations were electronic and likely on a regular basis. *Transcript*, at 4. The Court appeared to believe that the donations were directed to Holy Name and <u>not</u> the defendants in this case, the Archdiocese or Fr. Hecker. It is not known whether the Court made other financial donations of

3

cash or checks during service by placing the donations in one or both of the offering baskets that are circulated each mass.

As a parish within the Archdiocese, Holy Name is required to pay the Archdiocese yearly assessments. The assessments are based on the amount of income earned by Holy Name. 90-95% of a parish's income comes from donations like the ones this Court makes. In a deposition shortly after the Archdiocese filed bankruptcy, the Archdiocese's Vicar of Finance testified about these assessments and how they are calculated:

| | |
|---|---|
| QUESTION: | How do -- I just want to understand, how does the Debtor derive revenue from the Masses? |
| ARCHDIOCESE: | Because each parish is given collections every – every weekend, and <u>the assessments that the parishes pay to the Archdiocese is payable based on what we collect from the parishioners</u>. |
| QUESTION: | So -- so that the Archdiocese itself is not collecting this money, but it's a source of revenue for the parishes that enable it, the parishes, to pay the assessments; do I have that right? |
| ARCHDIOCESE: | All right. <u>The parish -- the parishes is the -- is the go - through for -- to the Archdiocese to pay these assessments</u>. |
| QUESTION: | Do you know what percentage of the parishes' revenues are derived from offerings and collections at Masses? |
| ARCHDIOCESE: | Well, I'm a parish priest so I can -- I can speak for myself. |
| QUESTION: | Okay. |

ARCHDIOCESE: <u>I would -- 90 -- 90 -- 95 percent of revenues for a parish comes from contributions each weekend</u>.

*Deposition of Fr. Patrick Carr, Vicar of Finance for ANO*, at 59-60 (08/12/20) (emphasis supplied), attached as Exhibit 4.

Another Archdiocese officer explained the assessment practice shortly after the Archdiocese filed for bankruptcy protection:

> So the accounts receivable from parishes are primarily comprised of the assessments related to a church assessment tax that is charged each of the parishes to support the operations of the administrative offices, and these are recurring assessments. Assessments for property, casualty, and workmen's comp insurance and other insurances. And then there is a third assessment that is done in the parishes for priest health insurance and related costs for priests.

*341 Meeting Transcript*, at 39-40 (5/29/2020) (emphasis supplied), attached as Exhibit 5.

Archdiocese financial disclosures corroborate that parishes like Holy Name pay the Archdiocese an assessment based on the income derived from donations like the Court's:

> The parish share is based on a series of incremental (marginal) graduated rates based on a parish's income. Income subject to assessment by the Archdiocese equals the total income of the parish minus capital campaign revenue minus school support. <u>Total income of a parish is comprised of ordinary income (weekly collections, etc.) and extraordinary income (fairs, fundraisers, etc.)</u>.

*Semi-Annual Financial information Fiscal Year 2020,* at 20 (emphasis supplied) [Bkrptcy. Rec. Doc. 203-7].

In addition to the assessments, parishes like Holy Name are required to pay at least some of its income from donations directly into an Archdiocesan account. In its bankruptcy, the Archdiocese disclosed the accounting practices that it directs its parishes to follow. In one document, the Archdiocese instructs the parishes, like Holy Name, how to structure its accounting. The parishes are required to maintain an "Archdiocesan Savings Account" for the following

purpose: "Include the balance of funds invested by the Parish in its savings accounts. <u>These savings accounts should be held in a deposit account by the Archdiocese</u>. Parish should use sub accounts for each savings account." *Appendix A, Church Parishes Chart of Accounts*, at 1, attached as Exhibit 6. As a result, at least some of the Court's donations were deposited directly into an account controlled by the defendant.

In fact, the Official Committee of Unsecured Creditors (who represent the interests of sexual abuse survivors) filed pleadings in the Archdiocese bankruptcy representing that Holy Name had <u>$1,571,736.37</u> in portfolio B – an account controlled by the Archdiocese. *Petition for Declaratory Judgment*, at 5, attached as Exhibit 7. These funds are comprised of donations held by the Archdiocese and, as such, are "property of the Archdiocese's estate". *Id.* at 2. At least some part of the Court's donations are likely included in the $1,571,736.37. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988) ("Most importantly, § 455(b)(4) requires disqualification no matter how insubstantial the financial interest and regardless of whether or not the interest actually creates an appearance of impropriety.").

Finally, the Court's donations to Holy Name even benefitted co-defendant Fr. Hecker until last month. The Archdiocese uses the assessments paid by the parishes to partially fund the priests' retirement fund:

> The Priests' Pension Fund shall receive its income and be supported and maintained by the following annual payments:
> An allocation from each Parish Assessment
>
> An assessment by each parish for the priests assigned to the parish
>
> An allocation from the annual Archdiocesan Priests Retirement Collection
>
> The amounts of the contributions provided for the above (a, b & c) shall be determined by the Archbishop of New Orleans, in consultation with the Administrative Council and the Finance Council."

*Archdiocesan Policies Manual*, at 3-16, attached as Exhibit 8.

As a result, part of the Court's donations until May 5, 2023 (when the bankruptcy court ordered the cessation of retirement benefits to Fr. Hecker) went into a retirement fund to pay for Fr. Hecker's retirement, healthcare, car insurance, and other miscellaneous expenses. This further entwines the Court's donations with another defendant in this case.[3]

## II. Disqualification is required pursuant to 28 USC 455(a).

Plaintiff also moves for disqualification pursuant to Section 455(a). The test to determine whether a judge should be recused is whether a "reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned." *In re Kensington Intern. Ltd.*, 368 F.3d 289, 301 (3d Cir. 2004). A court making the decision must consider how the facts would appear to a "well-informed, thoughtful, and objective observer, rather than the hypersensitive, cynical, and suspicious person." *U.S. v. Jordan*, 49 F.3d 152, 156 (5th Cir. 1995); *see also Bryce v. Episcopal Church in the Diocese of Col.*, 289 F.3d 648, 659 (10th Cir. 2002) ("The test is whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality." (*quoting Hinman v. Rogers*, 831 F.2d 937, 939 (10th Cir. 1987)).

---

[3] Disqualification pursuant to Section 455(b) does require a knowledge component by the Court, such that if the Court was unaware that her donations to Holy Name were in fact transferred to the Archdiocese (or that her donations funded Fr. Hecker's retirement benefits), then mandatory disqualification would not apply. There is no such knowledge requirement under Section 455(a). Health Servs. Acquisition Corp. v. Liljeberg, 796 F.2d 796, 802 (5th Cir. 1986), aff'd, 486 U.S. 847, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988) ("Under section 455(a), therefore, recusal is required even when a judge lacks actual knowledge of the facts indicating his interest or bias . . . .").

An "objective, reasonable observer" would "harbor doubts" about the Court's impartiality because she would reasonably conclude that (in addition to the aforementioned reasons) there is no meaningful difference between Holy Name of Jesus Parish and the Archdiocese itself such that donations to Holy Name Parish are no different than donations directly to the Archdiocese. In other words, a reasonable observer knowing all of the facts concerning the fiscal, managerial, and legal relationship between Holy Name and the Archdiocese would view them as indistinguishable in terms of purpose, ownership, and management.

One of the documents that details this relationship is the Parish Service Agreement. Article I of this Agreement identifies the services that the Archdiocese provides to Holy Name Parish. *Holy Name of Jesus and Archdiocese Parish Service Agreement*, attached as Exhibit 9. Pursuant to the Agreement, the Archdiocese provides the following services to Holy Name Parish: (1) the primary consultive resource for human resources services, such as insurance for all of Holy Name's employees, training the pastor, developing salary scale for employees, insurance benefits for the clergy, conduct criminal background checks, and develop, implement, and administer policies related the sexual abuse of minors, *id.* at 2-3; (2) procure accounting, financial, and liability insurance, *id.* at 3; (3) <u>invest and manage Holy Name funds</u>, *id.* (emphasis supplied); (4) direct the special collections during mass, *id.* at 4; (5) acts as primary resource over all legal matters, including for the direction of the settlement of claims against Holy Name, such that Holy Name is not allowed to settle any litigation without first obtaining Archdiocese approval, *id.* at 5; invest and manage the priest retirement fund, *id.* at 6; and (6) provide media communications on behalf of Holy Name, *id.*

Holy Name also "shall comply" with the Archdiocese in a number of functions: (1) with the "policy, procedural, and pastoral manuals of the Archdiocese", *id.* at 7; (2) conduct an internal

8

audit; (3) "in any campaigns and second collections determined by the president of the Archdiocese", *id.*; and (4) "participate and assist in funding the cost of seminary training and the care of retired priests pursuant to the amounts determined by the President of the Archdiocese", *id.*

The Archbishop also exercises plenary authority over the terms of the Agreement and with respect to alienating property. The Archbishop has absolute power to terminate the Agreement with Holy Name. *Id.* at 8. The Archdiocese has absolute authority to assign priests to Holy Name. *Id.* at 9. Holy Name must follow the Archbishop's "doctrine and governance". *Id.* Holy Name is not allowed to sell any property without the Archbishop's prior written consent. *See Archdiocese of New Orleans Policy Handbook February 2018 Section 1: Parishes* at 1-2, attached as Exhibit 10.

The Apostolates conceded to the bankruptcy court that: "<u>Directly or indirectly the Archdiocese or the Archbishop is the sole shareholder, member, or partner of each Apostolate</u>." *Verified Statement of the Apostolates Under Bankruptcy Rule 2019*, at 1 (05/04/20) (emphasis supplied), No. 20-10846 (E.D. La. Bkrptcy Ct.) [Rec. Doc. 40]. *See also Apostolates Objection to Motion to Dismiss*, at 2 No. 20-10846 [Rec. Doc. 341] (representing that the Apostolates and the Archdiocese hold money and property for one another "<u>that are held by the Archdiocese in trust or as agent for the Apostolates</u>") (emphasis supplied).

Finally, Holy Name is an interested party in the bankruptcy and made an appearance through the Apostolates. *List of Apostolates*, attached as Exhibit 11. As an Apostolate, Holy Name has informed the bankruptcy court that it will seek what is known as a "channeling injunction". *Apostolate's Response to Motion to Compel*, at 3 (05/12/22), attached as Exhibit 12. ("<u>The Channeling Injunction provision of the Plan solely relates to the abuse claimants</u>.") (emphasis

9

supplied). This means that Holy Name will move the bankruptcy court for an order seeking to be added as a protected party from liability related to childhood sexual abuse, like the allegations in this case. *See Humana, Inc. v. Shrader & Assocs., LLP*, 584 B.R. 658, 667 (S.D. Tex. 2018).

The Court's donations to Holy Name may be used to fund any possible future settlement by the Archdiocese or as a payment by Holy Name into the bankruptcy to become a party to the channeling injunction. Since Plaintiff has filed a claim into the bankruptcy, the Court's donations create an inappropriate financial conflict where the Court has voluntarily committed "skin in the game" adverse to Doe. A reasonable, informed observer would likely find that this justifies questioning the Court's impartiality.

## CONCLUSION

For all of the aforementioned argument, law, and facts, Plaintiff respectfully requests that this Court disqualify itself from this matter.

Respectfully submitted,

/s Soren Gisleson
SOREN E. GISLESON La Bar No. 26302
HERMAN, HERMAN & KATZ
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Tel: (504) 581-4892
Fax: (504) 561-6024
Email: sgisleson@hhklawfirm.com

-AND-

RICHARD C. TRAHANT (# 22653)
ATTORNEY AT LAW
2908 Hessmer Avenue
Metairie, LA 70002
Telephone: (504) 780-9891
FAX: (504) 780-9891
Email: trahant@trahantlawoffice.com

-AND-

JOHN H. DENENEA, JR. (#18861)
SHEARMAN~DENENEA, L.L.C.
4240 Canal Street
New Orleans, LA 70119
Telephone: (504) 304-4582
FAX: (504) 304-4587
jdenenea@midcitylaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing has been served on all counsel of record by operation of the Court's electronic filing system on this 23rd day of June, 2023.

S/Soren E. Gisleson